

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-17-00166-CR

---

JOHNNIE DUNNING                                        APPELLANT

V.

THE STATE OF TEXAS                                          STATE

----------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 0632435D

----------

## OPINION

----------

### I. INTRODUCTION

Appellant Johnnie Dunning raises a single point challenging the "not favorable" finding made by the trial court following post-conviction DNA testing pursuant to chapter 64 of the Texas Code of Criminal Procedure. For the reasons set forth below, we will sustain Dunning's point, vacate the trial court's "not favorable" finding, and remand this case to the trial court for an entry of a

finding that had the post-conviction DNA test results attained by Dunning been available during the trial of the offense, it is reasonably probable that Dunning would not have been convicted.[1]

## II. FACTUAL BACKGROUND

The evidence and testimony presented at the chapter 64 DNA hearing show the following factual background. In 1999 on the morning of Dunning's jury trial for the offense of aggravated sexual assault of a child by inserting his penis into the complainant's anus, after the jury had been sworn and Dunning had entered a plea of "not guilty," the trial court granted the State's motion in limine to

---

[1]The trial court's May 17, 2017 order finds that "the post-conviction forensic DNA testing results do not cast affirmative doubt on the defendant's guilt, and are, thus, NOT FAVORABLE, as defined by article 64.04 of the Texas Code of Criminal Procedure." We note that article 64.04 was amended in 2003 (prior to Dunning's 2010 motion for DNA testing and prior to the trial court's May 17, 2017 order) to eliminate the use of the word "favorable." *See* Act of April 3, 2001, 77th Leg., R.S., ch. 2, § 2, 2001 Tex. Gen. Laws 2, 4, *amended by* Act of May 9, 2003, 78th Leg., R.S., ch. 13, § 4, 2003 Tex. Gen. Laws 16 (current version at Tex. Code Crim. Proc. Ann. art. 64.04 (West Supp. 2017)). Article 64.04 no longer uses this standard; under the current version of article 64.04, the convicting court "shall hold a hearing and make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted." Tex. Code Crim. Proc. Ann. art. 64.04. Thus, to the extent, if any, the trial court's "not favorable" finding differs from a finding that had the results been available during the trial of the offense it is not reasonably probable the person would not have been convicted, because we review de novo this ultimate application-of-law-to-the-facts question not involving credibility and demeanor, we apply the current standard despite referring to the trial court's finding as "not favorable." *See Whitfield v. State*, 430 S.W.3d 405, 407 & n.1 (Tex. Crim. App. 2014) (recognizing trial court's "unfavorable findings" equated to finding under article 64.04 that there was no reasonable probability that defendant would not have been convicted had the results been available at his trial); *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002) (stating that this ultimate question is reviewed de novo on appeal).

2

exclude evidence of convictions by registered-sex-offender Lorne Clark and to prevent Dunning from making any arguments or statements that Clark was the actual assailant. Clark was the stepfather of, and lived in an apartment with, the mentally impaired and hearing impaired twelve-year-old male complainant. Dunning's planned defense at trial was that Clark—not Dunning—had in fact perpetrated the offense, and that Clark had influenced and manipulated his stepson to identify Dunning—"the black man"—as the perpetrator in order to steer the investigation away from himself.[2] Dunning explained that his defense

---

[2]At the chapter 64 DNA hearing, Dunning's trial counsel, David Pearson, testified, in part, as follows:

> Q. If you would, give us kind of a general -- and like I told the Judge in front of you a minute ago, I'm not asking to try this case. I just want to tell the Judge basically what the allegations were and kind of what the case was about in about 30 words or less.

> [PEARSON]: Well, the young victim, and I won't use his name, I don't remember whether he was -- a pseudonym was in the indictment or not, but he said that in an apartment complex laundry room allegedly the black man had had sex with him, but the witness that claimed that he heard him say that was a registered sex offender living in the same apartment that had been convicted of aggravated sexual assault in another state and had moved to Texas and moved into the same family home and was also convicted in this county a month before Mr. Dunning for aggravated sexual assault of two children in the same apartment, and he was a witness.

> Q. All right. Let me ask you this. Did you have a defense that you'd aligned in this case and gone over with Mr. Dunning about what y'all were going to try to defend this case with had he gone to trial?

> [PEARSON]: Yes, and that was our defense.

3

would be based on the facts that: Clark had been previously convicted of first degree sexual abuse of Clark's stepdaughter in Arkansas; about a month after Dunning's arrest, Clark had been arrested for sexual assault of two other female children who lived in the same apartment complex;[3] and, a few weeks before

---

Q. Was that somebody else had committed the offense, had an opportunity to be around the victim and was a registered sex offender?

[PEARSON]: Well, and that plus the fact that the victim, it was in the report, was mentally challenged and deaf. He would have been in my opinion easy to manipulate, and you have a convicted sex offender that would be a master manipulator of children by definition, and he wasn't used as an outcry, but he was the original witness number two that said that's what the child said to me. I got raped. The black man raped me.

Q. Okay. Now, and ultimately this child, a victim, picked Mr. Dunning out of a photo spread; is that correct?

[PEARSON]: Correct.

Q. And so it was your defense, then, that you were trying to present to the Court essentially that someone else who was a bad person had potentially kind of steered the investigation away from himself and was a sex offender in his own right; is that correct?

[PEARSON]: Well, that, and in my opinion that plus sloppy police work.

[3]Although it was suggested during the course of these proceedings that the two other female victims were the male complainant's siblings and although neither Defendant nor the State appeared to dispute the suggestion, our review of the record leads us to believe that the two other female victims were living in the same apartment complex but were unrelated to the complainant. In either case, the record reflects that Clark was convicted of sexual assault of two other children, occurring during the same time period and at the same apartment complex as the instant sexual assault.

4

Dunning's trial was scheduled to start, Clark had pleaded guilty to the sexual assault of the two other female children.

In anticipation of presenting his defense at trial that Clark was the perpetrator of the sexual assault on the complainant, Dunning had filed notice of his intent to offer copies of Clark's prior sexual abuse conviction in Arkansas. When the trial court ruled that Dunning would not be able to present this evidence, Dunning entered into a plea bargain. Dunning faced a life sentence because of two prior credit card abuse convictions that are no longer classified as felonies. When the State agreed to the minimum sentence of 25 years' confinement and the trial court agreed to grant Dunning permission to appeal the adverse ruling concerning the Lorne Clark evidence and arguments and also permitted Dunning to make a bill of exception, Dunning entered a guilty plea conditioned on these agreements.[4]

Although the State possessed a sexual assault kit containing various swabs, as well as the complainant's white shorts worn during and after the assault,[5] no DNA testing had been conducted on any of the items prior to trial.[6]

---

[4]Dunning timely filed a motion for new trial asserting that his decision to plead guilty was an error and was done solely because the exclusion on the morning of trial of any evidence or arguments concerning Clark—the "platform" of his case—which had left him "frantically scrambling." The trial court denied the motion.

[5]The September 3, 1996 police report, also offered into evidence at the chapter 64 DNA hearing, established that the complainant did not bathe, wash his genitals, or change his clothes prior to the administration of the sexual assault kit by the Fort Worth Police Department.

[6]Pearson testified about the significance DNA testing in this case:

Q.  Was there DNA testing done in this case prior to the entry of a plea?

[PEARSON]:  No.

Q. To your knowledge by the State or the Defense?

[PEARSON]:  Right. Not to my knowledge, no DNA testing was done.

Q.  There was some serology, but there wasn't any actual DNA testing; is that correct?

[PEARSON]:  Correct.

. . . .

Q.  Have you ever tried a DNA case?

[PEARSON]: Have I tried cases involving DNA?  Yes.

Q.  In your opinion in a sexual assault case of a child who is alleging that he's been anally sexually assaulted, would DNA findings on a piece of clothing the child was wearing at the time that had DNA on the back side of the pants or the underwear, if that was underwear that the child wore or was wearing, would that be relevant in the guilt or innocence of the defendant potentially?

[PEARSON]:  Yes.

Q.  A no result could mean something, correct?

[PEARSON]:  Right.

Q.  Certainly if it was the Defendant in that case's DNA, that would be very good for the State, would it not?

[PEARSON]:  Correct.

In accordance with Dunning's plea bargain conditioned on his right to appeal the trial court's ruling concerning the Lorne Clark evidence and arguments, Dunning did appeal. Seventeen years ago, this court affirmed Dunning's conviction, noting that the case "presented a very close question" and that other than the complainant's identification of Dunning in a photographic line-up, "[n]o other evidence linked [Dunning] to the offense." *Dunning v. State*, No. 02-99-00311-CR, pp. 2, 5 (Tex. App.—Fort Worth, Feb. 22, 2001, pet. ref'd) (not designated for publication).

### III. PROCEDURAL BACKGROUND CONCERNING POST-CONVICTION DNA TESTING

In 2010, Dunning began requesting a post-conviction DNA test pursuant to chapter 64 of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. art. 64.01 (West Supp. 2017). Ultimately, after an approximately four-year delay for reasons not relevant here, the trial court ordered the Department of Public

---

Q. And if the DNA findings were some third party unknown that were not the Defendant and not the perpetrator, that could also be relevant, correct?

[PEARSON]: Right.

Q. And in that last instance is it your opinion that that could be relevant and material in a jury finding that the person was not guilty if they believed all that?

[PEARSON]: Yes. It would be relevant.

Q. It could go either way, but it would certainly be something that would be relevant; would you agree with that?

[PEARSON]: Yes, no question.

Safety to conduct DNA testing of the complainant's white shorts and several additional items in the sexual assault kit but denied Dunning's request for counsel at that time.[7]

The DPS Crime Laboratory determined the proper locations for testing and tested portions of the white shorts but found no interpretable DNA profile. Thus, the State moved for an entry of a not favorable finding. On June 9, 2015, the trial court found that the lab results were inconclusive and entered a not favorable finding. During his appeal of the June 9, 2015 not favorable finding, Dunning was appointed counsel, and he filed a motion to dismiss his appeal, which we granted. *See Dunning v. State*, No. 02-15-00222-CR, 2015 WL 5722605, at *1 (Tex. App.—Fort Worth Aug. 26, 2015, no pet.) (mem. op., not designated for publication).

Dunning then sought to conduct his own DNA testing and the trial court authorized the Serological Research Institute (SERI) to conduct the testing. Amy Lee, a forensic serologist at SERI, tested items, which included the white shorts, items in the sexual assault kit, and various swabs. The results and interpretations of SERI's testing are found in Lee's July 18, 2016 report. Lee's report concerning SERI's testing contains seven different conclusions, including that Dunning was excluded as a donor of the DNA on all of the items tested (conclusions 2–5) and that, in addition to DNA of the complainant, there was also

_____

[7]*But see* Tex. Code Crim. Proc. Ann. art. 64.01(c).

DNA from a different person on the "crotch swab" of complainant's white shorts (conclusion 4).[8] Lee also concluded that both the complainant and Dunning were excluded as contributors to the DNA on the waistband swab of the white shorts (conclusion 5).

The State requested that Dr. Bruce Budowle review SERI's testing and the conclusions in Lee's report. The State filed an affidavit from Dr. Bodowle in which he agreed with all of Lee's conclusions except for part of conclusion 5, which excluded the complainant as a possible contributor of the DNA located on the white shorts waistband swab. Dr. Budowle stated, "While I agree that Johnnie Dunning can be excluded as a possible contributor of the major portion of the mixture, the victim . . . cannot be excluded as a possible contributor . . . ." Thus, even in his disagreement about part of conclusion 5, Dr. Budowle still agreed with Lee that none of Dunning's DNA was found on any of the items tested.

On February 28, 2017, the trial court conducted a chapter 64 DNA hearing and received testimony from Dunning's trial counsel, Amy Lee, Dr. Budowle, and Dunning. As set forth in the footnoted quotations from Dunning's trial counsel's testimony at the chapter 64 DNA hearing, Dunning's planned trial defense was to suggest that Clark—who was a registered sex offender, who had been convicted in Arkansas of sexual abuse of his stepdaughter, who had been convicted of

---

[8]It was suggested at oral argument that this third-party DNA was specifically male DNA.

sexual assault of two other children who lived in complainant's apartment complex, and who had helped the complainant report the offense and identify Dunning as the assailant—was actually the perpetrator. The trial court's morning-of-trial ruling excluding this evidence after Dunning had pleaded not guilty led to the plea bargain and Dunning's guilty plea. Dunning's trial counsel opined that DNA findings on the complainant's clothing including a third person, not the victim and not Dunning, and excluding Dunning as a contributor to all DNA tested, would have been material and relevant to Dunning's guilt or innocence but that there was no DNA testing done prior to Dunning's guilty plea.

The trial court also heard testimony from Amy Lee and Dr. Budowle. Both Lee and Dr. Budowle agreed that Dunning's DNA was not found present on any of the items tested.[9] Lee was asked about her conclusions, and in particular, her findings about the complainant's white shorts:

---

[9]The State conceded that the post-conviction DNA testing excluded Dunning as a contributor of any DNA found on any of the items tested:

> [PROSECUTOR]: I don't think -- I don't think anybody is disputing that Mr. Dunning's DNA is not on any of these items. I think Ms. Lee said that; I think Dr. Budowle said that.
>
> . . . .
>
> [DEFENSE COUNSEL]: He's [Dunning] excluded in more than one place, and that's not in dispute. I mean he is absolutely excluded as being the contributor to the DNA anywhere in this case.
>
> THE COURT: And that's -- you do agree with that, [Prosecutor]?

Q. So what you're saying in summary is the DNA on the victim's shorts, and this is -- if we go back and look, these are shorts that the swab actually came from -- where was the swab? What part of the underwear did the swab touch? It's the rear area of the pants; is that right?

A. I believe it was described as 'crotch.'

Q. And that sample there has two people's DNA, right?

A. At least, yes.

Q. One of them belongs to the victim, right?

A. Correct.

Q. And the other one does not belong to Johnnie Dunning; is that right?

A. That's correct.

Thus, Lee's testimony confirmed that DNA existed on the complainant's white shorts that was not attributable to Dunning or to the complainant.[10]

---

[PROSECUTOR]: Yes, I do agree with that.

[10]Conclusions 4 and 5 set forth in Lee's report provide:

4. A mixture of at least two individuals was obtained from the shorts crotch swab (02-01-AB, item 4-4) and the shorts crotch extract (02-01 AB, item 5-2). Victim RFF is included as the major contributor to both mixtures and the chance that another random person unrelated to him could be similarly included is approximately one in one billion for items 4-4 and 5-2. Johnnie Dunning is <u>excluded</u> as a possible contributor to both mixtures.

5. A mixture of a least two individuals was obtained from the shorts waistband swab (02-01-AA, item 4-3). Victim RRF and Johnnie Dunning are both <u>excluded</u> as possible contributors to the major portion of this mixture. There is insufficient information in the minor component of this mixture for any conclusions to be made.

11

With only slight variances, Dr. Budowle's live testimony reaffirmed his affidavit, which provided that he was in agreement with SERI's conclusions except for part of conclusion 5. Dr. Budowle testified live that he was "cautious" concerning SERI's conclusion 4 although he did not disagree outright with it. Dr. Budowle also expressed some disagreement on how SERI performed its statistical analysis, but stopped short of any type of reliability challenge to the protocols utilized by SERI in obtaining statistical data. Ultimately, Dr. Budowle testified on cross-examination:

> [DEFENSE COUNSEL]: Q. But the fact of the matter is you don't have any dispute that this little boy's underwear has got his DNA on it and got somebody else's DNA on it, right?
>
> A. I don't dispute that, no.
>
> [DEFENSE COUNSEL]: Q. And that somebody else's DNA is not Johnnie Dunning's?
>
> A. I don't dispute that, no.

Dunning testified that identity was an issue at the trial.

After hearing and considering all of the above evidence, the trial court entered a "not favorable" finding under article 64.04 after finding that the post-conviction DNA testing results did "not cast affirmative doubt on the defendant's guilt[.]" The trial court did not enter separate findings.

## IV. STANDARD OF REVIEW

When reviewing a trial court's finding in a chapter 64 post-conviction-DNA-test proceeding as to whether, had the results been available during the trial of

12

the offense, it is reasonably probable that the person would not have been convicted, we apply the same standard of review applied to review a trial court's ruling granting or denying DNA testing under article 64.03. *See* Tex. Code Crim. Proc. Ann. arts. 64.03, 64.04 (West Supp. 2017); *Asberry v. State*, 507 S.W.3d 227, 228–29 (Tex. Crim. App. 2016) (explaining that "we do not see any reason to treat a review of a ruling pursuant to Article 64.04 differently than a ruling pursuant to Article 64.03"). That is, we use the familiar bifurcated standard of review articulated in *Guzman v. State*: we give almost total deference to the judge's resolution of historical fact issues supported by the record and applications-of-law-to-fact issues turning on witness credibility and demeanor and we review de novo all other application-of-law-to-fact questions. 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *see also Reed v. State*, No. AP-77,054, 2017 WL 1337661, at *6 (Tex. Crim. App. Apr. 12, 2017), *petition for cert. filed*, (U.S. Feb. 1, 2018) (No. 17-1093); *Rivera,* 89 S.W.3d at 59. We review the entire record, that is, all of the evidence that was available to, and considered by, the trial court in making its ruling, including testimony from the original trial. *Asberry*, 507 S.W.3d at 228. The ultimate question of whether a reasonable probability exists that exculpatory DNA tests would have caused the appellant to not be convicted "is an application-of-the-law-to-fact question that does not turn on credibility and demeanor and is therefore reviewed *de novo*." *See Rivera*, 89 S.W.3d at 59.

## V. THE LAW CONCERNING FINDINGS ON POST-CONVICTION DNA TESTING

The purpose of post-conviction DNA testing is to provide a means through which a defendant may establish his innocence by excluding himself as the perpetrator of the offense of which he was convicted. *See Blacklock v. State*, 235 S.W.3d 231, 232–33 (Tex. Crim. App. 2007). Chapter 64 of the code of criminal procedure provides that a convicted person may submit a motion to the convicting court to obtain post-conviction DNA testing. Tex. Code Crim. Proc. Ann. art. 64.01; *Ex parte Gutierrez*, 337 S.W.3d 883, 889 (Tex. Crim. App. 2011). If such DNA testing is conducted, the convicting court shall hold a hearing and make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted. Tex. Code Crim. Proc. Ann. art. 64.04; *see also Solomon v. State*, No. 02-13-00593-CR, 2015 WL 601877, at *4 (Tex. App.—Fort Worth Feb. 12, 2015, no pet.) (mem. op., not designated for publication). The defendant may appeal a trial court's finding that even if DNA testing results had been available during the trial of the offense, it is not reasonably probable that the person would not have been convicted. *See* Tex. Code Crim. Proc. Ann. art. 64.05 (West 2006); *Whitfield*, 430 S.W.3d at 409.

To be entitled to a finding that, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted, "[t]he defendant must prove that, had the results of the DNA test been available at trial, there is a 51% chance that the defendant would not have been

14

convicted." *Glover v. State*, 445 S.W.3d 858, 861 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *Medford v. State*, No. 02-15-00055-CR, 2015 WL 7008030, at *3 (Tex. App.—Fort Worth Nov. 12, 2015, pet. ref'd) (mem. op., not designated for publication). A defendant is not required to establish actual innocence to be entitled to a favorable finding. *See Glover,* 445 S.W.3d at 862.

## VI. ANALYSIS

On appeal, the State argues that the lack of Dunning's DNA on any of the items tested does not establish Dunning's innocence and that even if the DNA test results are exculpatory, Dunning's judicial admission and the complainant's identification of Dunning from a photographic line-up are sufficient evidence of Dunning's guilt to preclude a finding that had the results of the DNA test been available at trial, there is a 51% chance that the defendant would not have been convicted. Concerning the results of the DNA tests, the State does not mention or address the DNA testing of the "shorts crotch swab" or the "shorts crotch extract" test results set forth in Lee's conclusion 4—that a mixture of at least two individuals' DNA was found on both the "shorts crotch swab" and the "shorts crotch extract" and that although the complainant was the major contributor to both mixtures, Dunning was excluded as a contributor to both mixtures. Instead, the State focuses its arguments on the "waistband swab" DNA test results set forth in Lee's conclusion 5 to argue that "it can be presumed that the trial court agreed that [the complainant] could not be excluded as a potential contributor to

15

the DNA profile obtained from the waistband swab, and that the presence of minor DNA profiles did not establish an alternate perpetrator."

Dunning, on the other hand, focuses his arguments on the "shorts crotch swab" and the "shorts crotch extract[,]" Lee's conclusion 4, and Dr. Budowle's agreement with Lee's conclusion 4 that the "shorts crotch swab" contained a mixture of the complainant's DNA and the DNA of another person who was not Johnnie Dunning. Dunning argues that—because the complainant was still wearing the white shorts when he was taken to the hospital; because police seized the shorts from the hospital; because the police report documents that the complainant did not bathe, wash his genitals, or change his clothes, or otherwise interrupt the "chain of custody" of the items tested; and because Lee and Dr. Budowle agree that a third person's DNA was found in the "shorts crotch swab" and the "shorts crotch swab extract"—if this exculpatory DNA evidence had been available during the trial of the offense, it is reasonably probable that Dunning would not have been convicted.

First, we agree with Dunning that the post-conviction DNA test results in this case excluding him as a contributor to any DNA found on any item tested and establishing the existence of another DNA contributor—that is not Dunning and is not the complainant—to a mixture of DNA on the complainant's shorts in the "shorts crotch swab" and the "shorts crotch extract" is exculpatory. *See, e.g.*, *Reed*, 2017 WL 1337661, at *6 (explaining that exculpatory results are necessarily results excluding the convicted person as the donor of the material).

This is not a case, like those relied upon by the State, where DNA evidence of the convicted defendant is simply absent or where the DNA evidence is inconclusive as to whether the convicted defendant was a contributor. *See, e.g.*, *Booker v. State*, 155 S.W.3d 259, 266–67 (Tex. App.—Dallas 2004, no pet.) (upholding trial court's negative finding because DNA testing did not exclude appellant as the assailant); *Fuentes v. State*, 128 S.W.3d 786, 787 (Tex. App.— Amarillo 2004, pet. ref'd) (upholding trial court's negative finding when post-conviction DNA testing revealed DNA profile from the sperm fraction of the semen on the victim's panties to be consistent with a mixture of the convicted defendant and the victim). Nor is this a case where the effect of exculpatory DNA evidence is to merely muddy the waters. *LaRue v. State*, 518 S.W.3d 439, 446 (Tex. Crim. App. 2017) ("The required showing [for DNA testing] has not been made if exculpatory test results would 'merely muddy the waters.'") (quoting *Rivera*, 89 S.W.3d at 59). In this case, the post-conviction DNA test results do more than merely exclude Dunning as a contributor; there is additional DNA evidence. Both the State's expert Dr. Budowle and the defense expert Amy Lee agree that another person contributed DNA to the "shorts crotch swab" and the "shorts crotch extract" and agreed that this other person was not the complainant or Dunning.

Concerning Dunning's judicial confession, we note that chapter 64 expressly contemplates and authorizes post-conviction DNA testing even after a guilty plea. Tex. Code Crim. Proc. Ann. art. 64.03(b). Based on the clear

language in article 64.03, the court of criminal appeals has recognized that "[a]n appellant who entered a guilty plea is no more, or less, entitled to a favorable ruling on his Chapter 64 motion [for DNA testing] than one who plead[s] not guilty." *Bell v. State*, 90 S.W.3d 301, 307 (Tex. Crim. App. 2002). Thus, the mere fact that Dunning pleaded guilty cannot automatically render it not reasonably probable that had the DNA results been available during trial he would not have been convicted, or else there would be no reason to permit post-conviction DNA testing after guilty pleas. *Accord Blacklock*, 235 S.W.3d at 232 (reversing trial court's denial of post-conviction DNA testing despite defendant's guilty plea because "exculpatory DNA test results, excluding appellant as the donor of this material, would establish appellant's innocence"). And here, Dunning's judicial confession must be viewed in the context of the record before us showing the posture of his case when he made it. *See Asberry*, 507 S.W.3d at 228 (instructing appellate courts that in reviewing a trial court's article 64.04 finding, we review the entire record to determine whether appellant established that he would not have been convicted). That posture is that the day before his guilty plea, Dunning had entered a plea not guilty. He was prepared for a jury trial, but on the morning of trial, any evidence of Clark's prior convictions for sexual abuse of his stepdaughter in Arkansas and argument concerning the "platform" of his defense—that Clark was the actual assailant—was excluded when the trial court granted the State's motion in limine. So, Dunning changed his plea to guilty and made a judicial confession to attain a plea-bargained

18

sentence of the 25-year minimum because his indictment alleged two prior felony convictions for credit card abuse and because he faced a life sentence.

Concerning the inculpatory evidence against Dunning consisting of the complainant's identification of him from a photographic line-up, again, the court of criminal appeals has recognized in the context of chapter 64 motions for post-conviction DNA testing, following a sexual assault conviction,

> eye-witness identification of [appellant] is of no consequence in considering whether [appellant] has established that, by a preponderance of the evidence, exculpatory DNA tests would prove his innocence.  In sexual assault cases like this, *any overwhelming eye-witness identification and strong circumstantial evidence . . . supporting guilt is inconsequential* when assessing whether a convicted person has sufficiently alleged that exculpatory DNA evidence would prove his innocence under Article 64.03(a)(2)(A).

*Esparza v. State*, 282 S.W.3d 913, 922 (Tex. Crim. App. 2009) (emphasis added).  Thus, again, the mere fact that the complainant identified Dunning in a photographic line-up cannot automatically render it not reasonably probable that had the DNA results been available during trial he would not have been convicted, or else there would be no reason to permit post-conviction DNA testing if a complainant identifies the alleged defendant.  We must consider the complainant's identification of Dunning along with the undisputed facts that the complainant was twelve years old, was mentally impaired and hearing impaired, lived with Clark, and according to Dunning's trial counsel, could have been easily manipulated by Clark to deflect suspicion away from himself, and that Clark had

spoken to police and reported that the complainant had said that "a black man raped me."

In summary, examining the entire record, giving almost total deference to the trial court's resolution of disputed historical fact issues supported by the record and applications-of-law-to-fact issues turning on witness credibility and demeanor, the record before us reflects: that Dunning had pleaded not guilty; that Dunning was prepared to begin trial before a jury, that Dunning signed a judicial confession the morning of trial only after the trial court ruled he could not present Clark's Arkansas conviction to the jury or mention or present arguments concerning Clark; that Dunning faced up to a life sentence and that, in exchange for his guilty plea and judicial confession, the State agreed to the minimum 25-year sentence; that within three weeks of his guilty plea Dunning filed a pro se motion for new trial explaining that his decision to plead guilty was an error and was made based on the exclusion on the morning of trial of any evidence or arguments concerning Clark—the "platform" of his case—which had left him "frantically scrambling"; that identity was an issue—in fact, the only issue; that the DNA test results established the absence of Dunning's DNA on all tested items—including the crotch of complainant's shorts worn during the sexual assault and not removed until the complainant reached the hospital; that the DNA test results established that not only was Dunning's DNA not present in the "shorts crotch swab," but that another person's DNA was present there along with the complainant's DNA; and that Dunning's and the State's experts both

20

agreed that another person—who was not Dunning and not the complainant—had contributed DNA to the "shorts crotch swab" tested and to the "shorts crotch extract" tested. In light of all of these facts—including Dunning's judicial confession and the complainant's identification of Dunning from a photographic lineup—applying a de novo standard of review to the application-of-the-law-to-the-fact-issue of whether Dunning has proved that had the post-conviction DNA test results we now have been available during the trial of the offense it is reasonably probable that he would not have been convicted, we hold that he has so proven by a preponderance of the evidence; that is, there is a 51% chance that a reasonable juror would have had a reasonable doubt about Dunning's guilt had the current post-conviction DNA test results been available at the time of trial. *See* Tex. Code Crim. Proc. Ann. art. 64.04; *Glover*, 445 S.W.3d at 861; *accord Routier v. State*, 273 S.W.3d 241, 259 (Tex. Crim. App. 2008) (reversing order denying DNA testing of certain items because such testing could add DNA evidence "to the evidentiary mix" that would have corroborated appellant's theory of an alternate assailant and "could readily have tipped the jury's verdict in appellant's favor"); *State v. Long*, No. 10-14-00330-CR, 2015 WL 2353017, at *3 (Tex. App.—Waco May 14, 2015, no pet.) (mem. op., not designated for publication) (affirming a trial court's "favorable" finding when "there was no DNA evidence found on any evidence that matched the profile of [appellee]"); *Solomon*, 2015 WL 601877, at *5 (affirming a trial court's not favorable finding because even though "the test results did not add any further corroboration for

21

appellant's guilt, they also *did not affirmatively link someone else to the crime* or conclusively exclude appellant's commission of it") (emphasis added).

We sustain Dunning's sole point.

## VII. CONCLUSION

Having held that Dunning established a reasonable probability that he would not likely have been convicted had the post-conviction DNA testing been available at the time of trial, we sustain Dunning's sole point of error, vacate the trial court's May 17, 2017 "not favorable" finding, and remand this case to the trial court for an entry of a finding that had the post-conviction DNA test results attained by Dunning been available during the trial of the offense, it is reasonably probable that Dunning would not have been convicted.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL:  WALKER, MEIER, and KERR, JJ.

PUBLISH

DELIVERED:  March 1, 2018