

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00120-CR

———————————————

AUSTIN TAYLOR COPPLE, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1411370D

Before Sudderth, C.J.; Gabriel and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Austin Taylor Copple moved for post-conviction DNA testing under Chapter 64 of the Code of Criminal Procedure. In one issue, Copple argues that the trial court erred by denying his motion. We will affirm.

### II. BACKGROUND

A jury found Copple guilty of aggravated assault with a deadly weapon and assessed punishment at seventy-five years' incarceration, and this court affirmed, holding in part that the evidence was sufficient to support the jury's verdict. *See Copple v. State*, No. 02-16-00197-CR, 2017 WL 1287544 (Tex. App.—Fort Worth Apr. 6, 2017, pet. ref'd) (mem. op., not designated for publication). Many of the facts recited here are also recited in that opinion. *Id.*

Lance Boltz, a Bedford resident, owned a home repair and landscaping business. Copple occasionally worked for Boltz and lived with him for about a month. Near 2 a.m. one day in the spring of 2015, after Copple had stopped living with Boltz, Copple called Boltz and asked him to drive Copple to a job later that morning. Boltz agreed to do so and picked Copple up from a house in North Richland Hills. They both returned to Boltz's house. According to Boltz, he told Wesley Price, another houseguest, about Copple's presence there, although Price said that he was unaware of Copple's presence and never saw him in the house. Boltz then allegedly went into his room and fell asleep.

Later, Boltz awoke when someone began repeatedly striking his head. Through some light coming from a fish aquarium, Boltz saw a silhouette of his attacker and of a machete that Boltz recognized as one that he used in his lawn service business. Boltz raised his hands to protect against the blows, but the attacker hit his hands with the machete, and Boltz blacked out.

When Boltz regained consciousness, he noticed that he was bleeding. He got out of his bed and attempted to shut and lock his bedroom door, but someone again began striking his head. From the limited light in the room, including the aquarium light and light from a neighbor's house, Boltz recognized Copple as the attacker. By Boltz's account, Copple was wearing the same clothes as when Boltz had picked him up, including a dark shirt and a hunting vest. As Copple continued striking Boltz, Boltz again blacked out.

When Boltz came to, he walked into a bathroom, locked the door, and realized that he had "a lot of blood profusely pouring down the front of [his] face." Price awoke and came to the bathroom, and Boltz asked Price to get help. Price noticed that Boltz's Samsung cell phone was missing, and Price went to another house to call 911. An ambulance arrived and transported Boltz to a hospital, where he received treatment for injuries to several parts of his body.

Police officer Michael Kratky interviewed Boltz at the hospital. Kratky saw that Boltz had several injuries and had been bleeding. Boltz told Kratky that Copple had attacked him. At about 7 a.m. that day, Detective Anthony Shelly received a call

3

about the assault. He went to Boltz's house and saw blood covering floors, pillows, and sheets.

Without any knowledge of what had occurred at Boltz's house, Officer Rodney Pace was working in Hurst and received a call about a man engaging in suspicious acts, including looking into a vehicle whose owner had left the vehicle running with the door open and looking through a mailbox, at a location that was within walking distance of Boltz's house. Pace found Copple, who matched the description given in the call. According to Pace, Copple was "scratched up," had no shoes on, and "was obviously high on some kind of drug." Copple could not provide a sensible story about why he was there.

Investigator Zachary Hicks became involved in the investigation into the assault on Boltz. Looking for evidence related to the assault, he walked on a path from Boltz's house to where Pace had found Copple. In a drainage area along that path, he found a machete, a Samsung cell phone battery, and a package of bandages that matched a bandage that Copple had in his pocket upon his arrest.

When Boltz returned home from the hospital weeks later, he found the shirt and vest that Copple had worn on the morning of the assault. Those items were "caked in blood." He also found the shoes that Copple had been wearing that morning.[1]

---

[1]In the factual background section of this court's opinion related to Copple's direct appeal, the opinion states that Boltz found the shoes and clothing that Copple

4

Later, Hicks and another officer identified in the record only as "C. Regan" interviewed Copple. In the interview, Copple admitted that he had been at Boltz's house that morning. Copple told the interviewing officers that Boltz was acting weird and making sexual advances toward him, which made him feel uncomfortable. Copple said that he had left the house to buy some cigarettes even though he had no money. According to Regan, when he told Copple that Boltz had been assaulted, Copple's demeanor "completely changed." In response to this statement, Copple allegedly looked down, became quiet, and told the officers that he had been in Boltz's bedroom that morning and that Boltz had continued to make sexual advances toward him. As Copple explained his presence in Boltz's bedroom, Regan noted that "Copple had his hands and fingers, twisted and intertwined, as well as his feet and legs intertwined, as he was bending over at the waist." Regan stated that this was a significantly different posture than Copple had during the initial part of the interview, where, according to Regan, Copple's posture was "normal." Regan also said that this part of the conversation made Copple very nervous, prompting Copple to ask for a lawyer. During the interview, Copple also said that he had used methamphetamine the night before Boltz brought him to the house.

had worn "that night." *Copple*, 2017 WL 1287544 at *2. But later, in the analysis section of the opinion, the opinion describes Boltz's having found the clothes that Copple "had been wearing on the morning of the attack, and those clothes were 'caked in blood.'" *Id.* at *3. The record indicates that although it was dark outside, Boltz picked up Copple from his mother's house "[n]ear 2 a.m." *Id.* at *1. Because Boltz and Copple's interaction leading up to and including the assault all occurred in the early morning hours, we will use the term "morning" in this opinion.

5

After his conviction, Copple sought DNA testing under Chapter 64 of the Code of Criminal Procedure. Specifically, Copple sought the testing of swabs taken from the machete, small hairs found on the machete, and swabs taken from his own hands. The trial court denied Copple's motion. In its findings of fact, among other findings, the trial court specifically found that:

- Significant non-biological evidence establishes Copple's guilt.

- Boltz used machetes in his landscaping business and kept them hanging on his garage wall.

- The machete found by police was recovered in a concrete drainage ditch used by people to traverse the area.

- There is a tremendous likelihood of non-involved, third-party DNA being recovered from the machete.

- The absence of any probative DNA from Copple's hand swabs is not exculpatory because the evidence suggests Copple had already attempted to clean his hands.

- Copple cannot show by a preponderance of the evidence that, even if exculpatory results were obtained from DNA testing of this evidence, there is a greater than 50% likelihood that he would not have been convicted given the non-biological evidence establishing his guilt.

- Copple failed to meet the requirements of Article 64.03 for post-conviction forensic DNA testing.

In its conclusions of law, among other conclusions, the trial court concluded that:

- Given the significant non-biological evidence that Copple committed this aggravated assault with a deadly weapon and the tremendous likelihood of non-involved, third-party DNA on the machete, the defendant cannot

6

demonstrate by a preponderance of the evidence that, even if exculpatory results were obtained, there exists a greater than 50% likelihood that he would not have been convicted even if exculpatory results are obtained.

- Copple does not meet the requirements of Article 64.03 for post-conviction forensic DNA testing because he has not shown by a preponderance of the evidence that forensic DNA testing would establish a reasonable probability of his non-conviction.

- Copple's motion for forensic DNA testing is denied.

## III. DISCUSSION

In one issue, Copple argues that the trial court erred by denying his Chapter 64 motion for testing of swabs from the machete, hairs from the machete, and swabs from his hands. He also appears to argue that the trial court erred by denying his motion without holding a hearing. We disagree.

### A. Standard of Review

We review the trial court's decision with regard to DNA testing using a bifurcated standard of review. *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002). We afford almost total deference to the trial court's determination of historical fact and application-of-law-to-fact issues that turn on credibility and demeanor, while we review de novo other application-of-law-to-fact issues. *Id.*

### B. Applicable Law

Under Chapter 64 of the Texas Code of Criminal Procedure, a convicted person may file a motion for DNA testing in the convicting court. Tex. Code Crim. Proc. Ann. art. 64.01(a-1). The motion must be accompanied by a sworn affidavit

7

containing supporting facts. *Id.* The convicting court may order DNA testing if it finds that: (1) evidence still exists, is in a condition making DNA testing possible, and is subject to a chain of custody sufficient to establish that it has not been altered; (2) identity was or is an issue in the movant's case; and (3) the movant established by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing and the request is not made to unreasonably delay the sentence. Tex. Code Crim. Proc. Ann. art. 64.03(a); *Prible v. State*, 245 S.W.3d 466, 467–68 (Tex. Crim. App. 2008); *Thompson v. State*, 95 S.W.3d 469, 471 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd).

Under Article 64.03, a convicted person is not entitled to DNA testing unless he first shows that there is "greater than a 50% chance that he would not have been convicted if DNA testing provided exculpatory results." *Ex parte Gutierrez*, 337 S.W.3d 883, 899 (Tex. Crim. App. 2011) (quoting *Prible*, 245 S.W.3d at 467–68); *see also Smith v. State*, 165 S.W.3d 361, 364 (Tex. Crim. App. 2005). This burden is met "if the record shows that exculpatory DNA test results, excluding the defendant as the donor of the material, would establish, by a preponderance of the evidence, that the defendant would not have been convicted." *Gutierrez*, 337 S.W.3d at 899. "A 'favorable' DNA test result must be the sort of evidence that would affirmatively cast doubt upon the validity of the inmate's conviction; otherwise, DNA testing would simply 'muddy the waters.'" *Id.* at 892.

8

Generally, a movant does not satisfy his burden under Article 64.03 if "the record contains other substantial evidence of guilt independent of that for which the movant seeks DNA testing." *Swearingen v. State*, 303 S.W.3d 728, 736 (Tex. Crim. App. 2010); *see also Dunning v. State*, 572 S.W.3d 685, 698 (Tex. Crim. App. 2019) ("When the true exculpatory value of the test results are weighed against all of the inculpatory evidence, we conclude that Appellant has not shown that, had the results been available during the trial of the offense, it is reasonably probable that he would not have been convicted."). Moreover, when physical evidence is collected from a common area and could have been left by any of a number of people, meaning that DNA test results excluding the movant as the source would not also exclude the movant as the assailant, the movant has failed to meet the statutory requirements for post-conviction DNA testing of that evidence. *See Cate v. State*, 326 S.W.3d 388, 390 (Tex. App.—Amarillo 2010, pet. ref'd); *see also Pegues v. State*, 518 S.W.3d 529, 535 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (discussing the different situations in which Article 64.03 statutory requirements are met and when they are not). And when articles have been washed or cleaned in some manner, they are not considered probative of a movant's innocence. *See Rivera*, 89 S.W.3d at 60 n.20 ("The absence of appellant's DNA from any anal samples (if they existed) would also be unhelpful in establishing appellant's innocence, as the incriminating evidence could have been washed away during the time the child's body was in water."); *see also Baylor v. State*, No. 02-10-00561-CR, 2011 WL 4008026, at *1 (Tex. App.—Fort Worth Sept. 8, 2011,

9

no pet.) (mem. op., not designated for publication) (holding that trial court properly denied DNA testing on stocking cap possibly washed in time before its seizure because the absence of DNA results would not create a probability of non-conviction).

## C.     Substantial Evidence of Copple's Guilt

Here, the trial court specifically found that Copple could not show by a preponderance of the evidence that, even if exculpatory results were obtained from DNA testing of the evidence he requested, there was a greater than 50% likelihood that he would not have been convicted given the non-biological evidence establishing his guilt. Indeed, when Pace found Copple, he was within walking distance of Boltz's house, covered in scratches, and without shoes. A reasonable inference, which the jury at trial was free to believe, was that the scratches occurred as Copple attacked Boltz with the machete.

That Copple was Boltz's assailant was further bolstered by the fact that Boltz later found the shoes that Copple had been wearing the morning of the attack. He also found the blood-covered clothes that Boltz said that Copple had been wearing that morning and during the attack. The reasonable inference from this evidence is that after attacking Boltz but before walking away from the house, Copple had removed his clothing and shoes because of the blood contained on them. Further, on the path from Boltz's house to where Pace found Copple, police found a machete and bandages that matched a bandage that Copple had in his pocket upon his arrest. The

10

police also found a Samsung cell phone battery, and the jury heard that Boltz's Samsung phone was missing after the attack. And most significantly, Boltz identified Copple, a person he had known for several years, as his attacker. *See Threadgill v. State*, 146 S.W.3d 654, 663 (Tex. Crim. App. 2004) (relying on eyewitness testimony as sufficient to show a defendant's identity as a shooter).

Citing the Texas Court of Criminal Appeals decision in *Blacklock v. State*, 235 S.W.3d 231 (Tex. Crim. App. 2007), Copple argues that the fact that Boltz identified him as the assailant does "not refute his contention that DNA testing could prove his innocence by showing the attacker was another person." But Copple's reliance on *Blacklock* is misplaced. In *Blacklock*, "[t]he victim knew [Blacklock] and identified him . . . as the one who robbed and sexually assaulted her," and the evidence regarding "DNA testing . . . was inconclusive on the issue of identity." *Id.* at 232. Several years after his conviction, Blacklock filed a motion seeking post-conviction DNA testing "of semen left by the victim's attacker on the victim's pants and panties" and retesting of the semen sample collected "from the victim's vaginal smears." *Id.* When making this request, Blacklock demonstrated, "by a preponderance of the evidence, that the victim's lone attacker [was] the donor of the material for which [Blacklock sought] DNA testing." *Id.* Accordingly, the Court of Criminal Appeals determined that "on th[at] record, exculpatory DNA test results, excluding [Blacklock] as the donor of this material, would have established

11

[Blacklock's] innocence" even though "the victim testified that she knew [him] and identified him as her attacker." *Id.* at 232, 233.

Here, unlike in *Blacklock* where Blacklock demonstrated that only one potential person could have left DNA, the trial court specifically found that because the machete was recovered in a concrete drainage ditch used by people to traverse the area, there was "a tremendous likelihood of non-involved[,] third-party DNA being recovered from the machete." *See Weems v. State*, 550 S.W.3d 776, 780 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("If testing were used to show no DNA evidence from appellant on the tool, it may mean any number of things: he wore gloves; wiped the tool off; or did not leave a sufficient DNA sample to be analyzed. If another person's DNA is found on the tool, it could mean that the object was in a location others came into contact with it."). The trial court further found in this case that the absence of any probative DNA from Copple's hand swabs would not be exculpatory because the evidence suggested that Copple "had already attempted to clean his hands" prior to the swabs being taken. *See Rivera*, 89 S.W.3d at 60 n.20.

We conclude and hold that the trial court did not err by finding that—given the significant, non-biological evidence that Copple committed the aggravated assault with a deadly weapon and the tremendous likelihood of non-involved, third-party DNA on the machete—Copple cannot demonstrate by a preponderance of the evidence that, even if exculpatory results were obtained, there exists a greater than 50% likelihood that he would not have been convicted even if exculpatory results

were obtained. *See Prible*, 245 S.W.3d at 470 (affirming a trial court's denial of postconviction DNA testing because "even if the evidence was retested and determined to contain another person's DNA in addition to [the defendant's] DNA, it would not establish by [a] preponderance of the evidence that [the defendant] would not have been convicted"). Thus, the trial court did not err by denying Copple's motion for Article 64.03 DNA testing. We overrule this portion of Copple's sole issue.

## D. No Hearing Required

In the remainder of his sole issue, Copple seems to argue that the trial court erred by not holding a hearing regarding his Article 64.03 motion. *See* Tex. Code Crim. Proc. Ann. art. 64.03 (detailing the procedures for when a trial court may order post-conviction, forensic DNA testing). We disagree. As the Court of Criminal Appeals has made clear, an Article 64.03 proceeding is not a "criminal trial." *Gutierrez*, 337 S.W.3d at 893. As such, Article 64.03 "does not require any evidentiary hearing before the trial judge decides whether a convicted person is entitled to DNA testing." *Id.* Thus, the trial court did not err by not conducting an evidentiary hearing before denying Copple's motion. *See Rivera*, 89 S.W.3d at 58–59 (stating that Article 64.03 does not require a hearing of any sort concerning the convicting court's determination of whether a convicted person is entitled to DNA testing). We overrule the remainder of Copple's sole issue.

13

## IV. Conclusion

Having overruled Copple's sole issue on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 9, 2020