

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00032-CR

_____

MICHAEL JOSEPH GOWAN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. 30,832-C

---

Before Gabriel, Kerr, and Birdwell, JJ.
Per Curiam Memorandum Opinion

## MEMORANDUM OPINION

## I.  INTRODUCTION

After appellant Michael Joseph Gowan was convicted of aggravated sexual assault, aggravated kidnapping, and burglary, he filed a motion for forensic DNA testing of hairs found on the clothing of the complainant, fourteen-year-old Michelle;[1] hairs found in the van Michelle was forced into; and hairs found in a closet that Michelle escaped from.  After a lengthy and circuitous motion, testing, and hearing process, the trial court concluded that even if the DNA results had been available during Gowan's trial, it was not reasonably probable that he would have been acquitted.  Gowan argues that these conclusions were in error and alleges that he was harmed by the delayed assistance of counsel, his involuntary waiver of counsel at one of the DNA-test hearings, and the ineffective assistance of the counsel he was afforded.  We conclude that the DNA test results, when considered with the other evidence of Gowan's guilt, supported the trial court's conclusions that Gowan would have been convicted even if these results had been available at his trial.  Further, the record shows that many of Gowan's problems with counsel were of his own making and that he voluntarily waived his right to counsel at the hearing.  Similarly, Gowan

---

[1]Michelle was a pseudonym assigned to the complainant at trial.  *See* Tex. Code Crim. Proc. Ann. art. 57.02; *Gowan v. State*, 927 S.W.2d 246, 248 n.1 (Tex. App.—Fort Worth 1996, pet. ref'd).

cannot show that two of his appointed attorneys rendered ineffective assistance during the DNA proceeding. Accordingly, we affirm the trial court's orders.

## II. FACTUAL BACKGROUND

### A. FACTS LEADING TO GOWAN'S CONVICTIONS

Between May 1992 and October 1993, thirteen girls and women were sexually assaulted in Wichita County by a serial rapist. *Gowan*, 927 S.W.2d at 248. Gowan became a suspect in the assaults and was under surveillance. *Id.* A police officer saw Gowan routinely drive an older white van. *Id.* Another officer saw Gowan park the van a few houses down from Michelle's home on Lindale Street in September 1993. *Id.* A few days later, Michelle's neighbor saw a man matching Gowan's description peering through the windows of Michelle's house. *Id.*

Shortly after that, in the early morning hours of October 3, 1993, Michelle was startled awake after a man put his hands over her mouth. *Id.* Michelle tasted rubber, leading her to believe that the man was wearing latex gloves. *Id.* The man forced Michelle out of her bedroom window and took her to a white van parked down the street. *Id.* Another neighbor heard screaming, looked out her bedroom window, and saw a man cross her yard with a girl and forcibly put the girl in a white van that had a

3

red toolbox inside. *Id.* Michelle's stepfather also heard screaming and discovered that Michelle was gone and that her bedroom window was open.[2] *Id.*

The man drove Michelle to a field where he forced her to perform oral sex and then penetrated her female sexual organ and her anus with his sexual organ. *Id.* The man also placed his mouth on her female sexual organ. *Id.* During the kidnapping, Michelle stated that the man forcibly pulled her hair. Michelle remembered seeing a red toolbox in the van. The man then taped Michelle's arms, her eyes, and her mouth with duct tape. *Id.* After driving to a vacant house on Duval Street, the man taped Michelle's ankles together and left her in the garage. *Id.* When the man returned approximately thirty minutes later, he put Michelle in a bedroom closet before taping her mouth with duct tape. *Id.* Michelle was able to remove the duct tape from her mouth and eyes and escape the closet. *Id.* She was rescued after being seen hopping down the street. *Id.* Although Michelle could not positively identify Gowan as her attacker, her physical description matched Gowan and she unequivocally identified Gowan's white van as the vehicle she had been forced into.

Approximately one hour later at almost 4:00 a.m., Officer Sharon Ritchie saw a white van parked in front of Gowan's house on McGaha Street. She also saw a blue, two-door Buick drive toward McGaha Street with its lights off. *Id.* Although the

---

[2]Officers responded to the ensuing 911 calls and although one officer saw a white van travel at a high rate of speed on Lindale Street, he was unable to catch up to the van.

4

Buick initially approached the street slowly, it sped up as it neared Gowan's house and hit a curb before stopping. *Id.* The driver ran into Gowan's house. *Id.*

Three hours later, a detective went to knock on the door of Gowan's house and noticed the finger portion of a latex glove sticking out of the door jamb. *Id.* Officers found Gowan in the home,[3] and he admitted that he had driven the Buick earlier and that he had stolen a soft drink from a nearby convenience store.[4] *Id.* at 248–49. He also stated that only he and his girlfriend had keys to the van that was parked in front of the house, that neither had given the keys to anyone else that day, and that he regularly drove it. When officers searched the van, they found a red toolbox in the back as Michelle and her neighbor had described. Gowan's aunt later stated that she lived behind the vacant house on Duval Street and that Gowan knew the house was vacant.

As would be expected, the police had several pieces of physical evidence that were part of their case against Gowan. Latex gloves were found in Gowan's white van. Dried grass from Michelle's hair was similar to grass discovered under Gowan's bed at the McGaha house. The duct tape used to restrain, gag, and blind Michelle was similar to a roll of duct tape found in Gowan's white van. *Id.* at 249. Charles Linch, a trace analyst with the Texas Department of Public Safety (DPS), compared four fibers

---

[3]Gowan admitted that he had initially tried to hide under his bed when the officers knocked. *Id.*

[4]The police found no evidence that this theft had occurred.

5

from the duct tape found in the Duval closet to fibers from the carpet in Gowan's van and determined that they had the same characteristics. Carpet fibers found on Michelle's clothes exactly matched fibers from Gowan's van. *Id.* Linch could not exclude Michelle or Gowan as the source of a head hair found in the Duval closet (Hair #1).[5] Linch also testified that two forcibly removed head hairs found in the van's carpet and one hair found in the toolbox had the same characteristics as Michelle's hair. Two of the recovered hairs (one on the carpet and one in the toolbox) had been bleached or dyed, which Michelle testified she had done to her hair approximately two months before the sexual assault. *Id.* Judith Floyd, a DNA analyst, concluded that a head hair with an attached root and tissue, which was found in Gowan's van, matched Michelle's nuclear DNA (Hair #2).[6] Specifically the DNA profile from Hair #2 was "12.5 million times more likely if the DNA came from [Michelle] than if it came from an unknown individual."

A jury heard this evidence and found Gowan guilty of aggravated sexual assault, aggravated kidnapping, and burglary. *Id.* at 247. At punishment, seven other women testified that Gowan had previously sexually assaulted them and one woman stated that she had seen Gowan standing outside the sliding-glass door of her apartment. *Id.* at 249. The jury assessed his punishment at life confinement for

---

[5] Hair #1 was referred to in the trial court as 02-01-AA-01.

[6] Hair #2 apparently was identified as 02-01-AF-04.

aggravated sexual assault, life confinement for aggravated kidnapping, and ninety-nine years' confinement for burglary. *Id.* at 247. Gowan appealed his convictions, arguing that he should have been allowed to review evidence regarding the other sexual assaults in the area and that he was entitled to a new trial based on the State's failure to produce an exculpatory DNA report on semen recovered from one of the other, uncharged sexual assaults. *Id.* at 249–50. We affirmed the trial court's judgments. *Id.* at 248.

### B. FACTS SURROUNDING POSTCONVICTION MOTION

### 1. The Motion, the Resulting Testing, and Appointed Counsel

In August 2013, Gowan filed a pro se motion for forensic DNA testing of several hairs found in the Duval closet, on Michelle's clothes, and in the white van: "[f]oreign hairs on [Michelle's] clothing," "the 'at least one hair' from the Duval[] closet," "the two hairs from the roll of carpet" from the van, and "the one hair from the tool box." Gowan asserted that the hairs on Michelle's clothes were tested by a DPS criminalist, Wilson Young, who concluded that the hairs did not "connect[] Gowan to the offense." The "at least one hair" was Hair #1, which Linch testified did not definitively include or exclude Gowan or Michelle as a contributor. Gowan argued that three hairs recovered from the van's carpet (Hair #2, Hair #3, and Hair #4)[7] and two hairs found in the toolbox in the van (Hairs #6 and #7)[8] should have

---

[7]Gowan only mentioned two hairs, but four hairs were found in the van's carpet and were tested. These hairs were identified as 02-01-AF-01 (Hair #3), 02-01-

been tested for mitochondrial DNA because the results would have shown that he could not be connected to the van and, accordingly, to the crimes. *See* Tex. Code Crim. Proc. Ann. art. 64.01(b).

Based on Gowan's motion, the State began trying to determine if any of the physical evidence from Gowan's trial could be found and tested or retested. *See id.* art. 64.02(a)(2). After a lengthy process, the State eventually advised the trial court that it was not opposed "to DNA testing of the hairs in question." The State further represented that Hair #2, which had been linked to Michelle through nuclear DNA testing at trial, would be retested. Accordingly, the trial court granted Gowan's motion for testing and ordered the State to arrange for the "items" to be tested by DPS. *See id.* art. 64.03(a)–(c). The trial court did not specify exactly which hairs were to be tested or whether they were to be subject to nuclear or mitochondrial testing. The State later notified the trial court that testing could take some time because of a backlog and because of the "sheer number of hairs to be tested."[9]

---

AF-02 (Hair #4), and 02-01-AF-03 (Hair #5). As we previously mentioned, the hair found on the van's carpet that Floyd had connected to Michelle through nuclear DNA—Hair #2—appears to have been identified as 02-01-AF-04.

[8]Gowan requested further testing on only one toolbox hair, but there were two: Hair #6 was identified as 02-01-AD-01, and Hair #7 was 02-01-AD-02. But the State later tested both hairs, and Gowan pointed to those results in his pleadings.

[9]The State had asked for testing on more hairs than had been requested by Gowan—for example, 65 hairs found on Michelle's clothes.

Gowan requested appointed counsel; the trial court appointed William Hull, a public defender, to represent Gowan. *See id.* art. 64.01(c). Even though he was represented by counsel, Gowan filed numerous pro se motions, letters, declarations, and other pleadings. Shortly thereafter, Gowan began seeking Hull's removal. Gowan eventually filed a grievance against the Office of the Public Defender, causing Hull to move to withdraw. The trial court granted Hull's motion to withdraw, and Gowan requested "substitute" counsel. The trial court appointed Rick Bunch to represent Gowan.[10] Approximately one month later, Bunch moved to withdraw based on a conflict of interest: Gowan had filed complaints with the Texas State Bar against members of the North Texas Criminal Defense Lawyers' Association, of which Bunch was the president. The trial court granted Bunch's motion and appointed John Bennett to represent Gowan.

Shortly thereafter, Gowan began expressing his displeasure with Bennett and sought the appointment of "competent" counsel. Bennett moved to withdraw at Gowan's request. The trial court held a hearing on Gowan's and Bennett's motions, but denied Gowan's motion based on its finding that Gowan "failed to carry the burden of proving he is entitled to a new . . . counsel." The trial court also denied

---

[10]The trial court first appointed Jeff McKnight but quickly withdrew that appointment because McKnight was "not approved to take Appeal appointments" and substituted Bunch.

9

Bennett's motion to withdraw. Gowan continued to seek Bennett's withdrawal and filed a motion to proceed pro se.

After the testing was completed, the State notified the trial court and attached the lab reports. *See id.* art. 64.03(d)(3). The trial court then held a hearing on the results and their effect on Gowan's convictions. *See id.* art. 64.04.

## 2. The First Article 64.04 Hearing

### a. Knowing and voluntary waiver of counsel

At the start of the hearing, the trial court addressed Gowan's request to represent himself. *See Faretta v. California*, 422 U.S. 806, 835 (1975). Gowan stated that he believed his self-representation "would be helpful to both myself and the Court." Gowan affirmed that he had a GED, that he was competent, and that he was on no medications. He understood that he would not be given any help or special consideration because he was proceeding pro se. The trial court admonished Gowan of the "dangers and disadvantag[es]" of representing himself, which Gowan affirmed he understood:

> [A]lthough you're seeking to represent . . . yourself, I'm going to tell you that you're making a mistake. And the reason why is an attorney will be able to advise you as to your legal - - from a legal viewpoint of - - [Bennett] is trained to do that. He's been to law school for three years, and has practiced law, including criminal law. And you understand that in the opinion of the Court, that you're making a mistake if you're seeking not to be represented by an attorney.

10

Gowan did ask that Bennett be stand-by counsel at the hearing, which the trial court allowed. The court then explicitly concluded that Gowan's waiver of representation was knowing, intelligent, and voluntary.

### b. Reasonable-probability evidence

The trial court began the Article 64.04 hearing. Gowan first asserted that not all of the hairs he referred to in his motion had been subjected to mitochondrial testing, specifically Hair #1, Hair #6, and Hair #7. The lab report showed that DNA profiles could not be obtained from these three hairs by nuclear testing. Regarding Hair #1, the State pointed out that the jury had heard that this hair could not be definitively connected to Gowan or Michelle and convicted him anyway. And the State similarly argued that the toolbox hairs (Hair #6 and Hair #7), even if subjected to mitochondrial testing, would not exculpate Gowan because Floyd had determined through nuclear DNA testing that Hair #2 was Michelle's, placing her in the van. The State also noted that because Gowan's main argument was that Linch tampered with the hair evidence, Gowan would not be entitled to relief under Article 64.04 because such evidence necessarily would not be exculpatory.

John Witkowski, a DPS forensic scientist, testified regarding which hairs were sent for testing. All of the hairs found in the closet, two of which had roots, were sent. The two hairs from the toolbox were sent for retesting—Hair # 6 and Hair #7. He also testified that one of the hairs found in the van's carpet, which was only a shaft, was not sent for retesting because it appeared to have been cut—Hair #2. At

11

trial, Linch had testified that he had removed the root from Hair #2 and sent the root for DNA testing, leaving only the shaft.

Kristi Link, a forensic DNA analyst for DPS, testified that Michelle and Gowan were excluded as contributors to two head hairs recovered from the van's carpet—Hair #3 and Hair #4. These hairs were found to be from two different males. The third hair from the carpet—Hair #5—had no identifiable nuclear DNA profile. Three of the hairs found on Michelle's clothing were found to be 541 trillion, 40.4 million, and 334 trillion times more likely to be Michelle's than not. The nuclear DNA test of a hair that was found on the floor of the Duvall closet—Hair #8— revealed that it was 12.5 million times more likely that it originated from Michelle rather than from an unrelated, unknown individual.[11] Gowan was excluded as a contributor to this hair. No interpretable DNA profiles could be obtained from many of the hairs that were tested, including Hair #1, Hair #6, and Hair #7. But Link testified that other than Hair #3 and Hair #4, all hairs that had identifiable results came back as being Michelle's.

In response to Gowan's assertions that the hairs that could not be identified through nuclear DNA testing should have been tested for mitochondrial DNA, Link testified that mitochondrial DNA is "less specific" and can only exclude a possible contributor because the identified DNA is limited to matrilineal identifications. In

---

[11]This hair was identified as 02-01-AA-02.

12

other words, mitochondrial DNA identifies not a specific person but "everybody in the [same] family."

After both sides rested and closed the evidence, Gowan argued that because he and Michelle had been excluded as being contributors to Hair #3 and Hair #4 and because "there is no other evidence in the case sufficient to convict him," it was reasonably probable that he would not have been convicted if these later nuclear DNA test results had been available at his trial. The State responded that nothing in the DNA test results was exculpatory: "[T]he victim hairs came back to the victim, which does not exculpate him. . . . [T]he fact that there is an unknown male head hair inside of a van, in no way exculpates him as . . . the offender." The State then gave a lengthy, but comprehensive, explanation of the inculpatory evidence at trial, countering any argument that the subsequent DNA testing, even if available at trial, would have in reasonable probability resulted in Gowan's acquittal:

> [E]ven [Gowan] admitted to driving that van [on October 3, 1993]. Now, . . . he actually admitted to his aunt, who testified that he drove that van . . . that early morning in order to go to 7-Eleven to steal truck parts. But he told a different story to the police, that he drove the blue Buick to 7-Eleven in order to steal a soda, [but] he was unable to produce the remnants of that soda. And the 7-Eleven clerk testified that he paid attention to the regulars who come into that 7-Eleven, and he would have paid attention . . . if anyone new or unidentified would have come to that store, and he did not remember [Gowan].
>
> You have the fact that this is his . . . girlfriend's van, that . . . they shared the keys. And although they loaned the car to other people, which might explain why there were these unknown male head hairs in that car, that . . . they had full possession of those keys for at least two days prior to this offense. So there's . . . extensive ties of this to the

13

movant, to the van. And then you have a victim who actually went and saw the van after it occurred and identified that, yes, this is the van that she was forced into.

In addition, before she even saw his van, she described a red toolbox . . . . She discussed the placement of that red toolbox within the van, which matched . . . the placement of the red toolbox where it was found inside of his van.

And then going over to the closet, . . . there's questions of [the] significance of that closet hair. And if you actually look at the [trial] testimony . . ., there were . . . a lot of head hairs removed from the floor of that closet. There were many . . . characteristics shared by [Michelle] and [Gowan]. So there's at least one hair from the closet [i.e., Hair #1] that [the State] can't exclude [Gowan] as being [a contributor], but [Linch] also cannot say he wasn't [sic] a contributor.

And on cross, . . . his attorney was able to get out the fact that [Hair #1] belonged to maybe [Gowan], maybe [Michelle], or maybe somebody else. So . . . this hair that we're fighting about on the closet floor is not the linchpin of this case. It was a vacant house where they found many head hairs. And the fact that . . . as far as the jury heard, this might or might not have been his hair. So the fact that . . . the results have come back to show . . . that there was no interpretable results or that it was actually her hair, it's helpful to us because it backs up her story of being . . . placed into that closet . . . with her eyes duct-taped and her mouth duct-taped and her wrists duct-taped together and her ankles duct-taped together. I mean, and - - he delivered her there after raping her anally and vaginally and performing oral sex upon her and having her perform oral sex on him . . . and he's been tied to this van.

. . . [I]t came out at trial that he and his girlfriend got this van in January of 1993. Officer saw him driving the van in July of '93. Surveillance saw him in that van . . . go to a house very, very close, two or three houses down from the victim's house, and parked there for half an hour and then return later. And there was testimony . . . from a neighbor who saw a man, matching [Gowan's] description peering into windows. So he stalked [Michelle] before he raped her.

14

. . . [Gowan] did match . . . the description that [Michelle] gave of him.

How about the fact that she testified that the man who raped her was wearing gloves[?] . . . [A]nd she knew that because he put his hands in her mouth, and she could taste the plastic of the surgical gloves. Well, guess what, they found a surgical glove in that van. And, also, they found a surgical glove in the door jamb to the house where he was living.

I mean, Your Honor, . . . there's such an extremely strong case here. That the fact that . . . unknown men might or might not have shed a hair . . . into his van does not change anything. Does not exculpate him in the slightest. Nor does the fact that the victim's own hair was found in the closet where she says she was left, doesn't exculpate him either. There's nothing exculpatory about this evidence.

### c. The trial court's first Article 64.04 ruling and subsequent testing

Before ruling, the trial court questioned Gowan about Bennett's assistance as stand-by counsel, and Gowan affirmed that he was satisfied with Bennett's representation. The trial court then orally found that even had the results been available during trial, it was reasonably probable that Gowan would have been convicted anyway. Gowan stated that he wanted to appeal, and the trial court appointed Bennett to represent him. *See* Tex. Code Crim. Proc. Ann. art. 64.05.

The State then moved for further DNA testing of Hair #2 from the van's carpet using mitochondrial DNA "due to an abundance of caution."[12] Bennett then filed a motion to conduct mitochondrial DNA retesting on Hair #1, Hair #6, and

---

[12]The State and the trial court identified this hair as 02-01-AF-04 and as "[o]ne of two head hairs recovered from the carpet of [Gowan's] white van, with root and tissue attached, which was removed [by Linch] and sent for testing" to Floyd.

Hair #7 as well. The State responded that these three hairs were not subject to retesting because even if they "came back as not belonging" to Gowan, the results would not exculpate him. *See id.* art. 64.03(a)(2)(A). Bennett also filed a request for findings of fact and conclusions of law and a motion for new trial regarding the trial court's prior oral ruling under Article 64.04. He then moved to withdraw from representing Gowan because he was moving out of state.

The trial court signed an order, along with supporting findings and conclusions, that "had the test results been available during the trial of the offense, it is NOT reasonably probable that Michael Joseph Gowan would not have been convicted." The trial court in a separate order then denied Gowan's motion to retest Hair #1, Hair #6, and Hair #7 for mitochondrial DNA but granted the State's motion for further retesting of Hair #2. Bennett was granted leave to withdraw, and the trial court appointed Tim Copeland to represent Gowan.

After Copeland filed an appellate brief on Gowan's behalf, Gowan moved to represent himself on appeal, and we abated the appeal to determine if Copeland should be withdrawn from representation and whether Gowan should represent himself. At the abatement hearing, Gowan recognized that he had been satisfied with none of his numerous appointed attorneys, but he averred that he did not want to represent himself. The trial court appointed Michael Payne to represent Gowan "with the understanding that only under very, very extreme circumstances would [the trial court] allow . . . any additional substitution of counsel. This is a situation in which

16

this case needs to move forward and Mr. Gowan's going to get his wish, but it's going to be limited." As such, we denied Gowan's motion to represent himself and struck Copeland's appellate brief.

### 3. Second Article 64.04 Hearing After Subsequent Testing

Shortly thereafter, the trial court held a hearing on the mitochondrial DNA testing that had been performed on Hair #2, which no longer had a root. Kendra Filepe-Ortega, a senior forensic analyst for the University of North Texas's Center for Human Identification, testified that mitochondrial testing showed that Michelle could not be excluded as a contributor to Hair #2. The trial court found "that had the test results been available during the trial of the offense, it is NOT reasonably probable that Michael Joseph Gowan would NOT have been convicted." No party requested, and the trial court did not enter, separate findings of fact.[13]

### 4. Appellate Briefing and Self-Representation

After several notices and warnings regarding Payne's failure to timely file an appellate brief, we abated the appeal. Payne filed a motion to withdraw as a result of Gowan's request that he do so and based on "an irreconcilable conflict as to how to proceed with [Gowan's] appeal in that [Gowan] has insisted that certain matters of fact be contained in [the] brief which [Payne] can not in good faith support and who

---

[13]Although the trial court entitled its denial order to be findings and conclusions, the order contains only one conclusion: It was not reasonably probable that Gowan would not have been convicted if the result of the mitochondrial DNA test of Hair #2 had been available for trial.

17

believes that he is ethically bound to not submit to [this] court." The trial court again admonished Gowan of the dangers of representing himself and determined that Gowan voluntarily wanted to proceed pro se on appeal. The trial court granted Payne's motion to withdraw. Gowan then filed a 68-page brief and a 48-page reply brief in this court, arguing that the trial court should have granted him postconviction relief based on the DNA test results and that counsel's assistance, or lack thereof, prevented him from obtaining that relief.

## III. RULINGS UNDER ARTICLE 64.04

### A. STANDARD OF REVIEW

Once forensic DNA testing has been ordered by a convicting court, as occurred here, that court must hold a hearing to determine "whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted." *Id.* art. 64.04. In other words, the convicting court is to determine whether the results would cast affirmative doubt on the validity of the conviction based on "the exculpatory value, if any, of the test results and whether the results meet the standard set out in Article 64.04." *Dunning v. State*, 572 S.W.3d 685, 697 (Tex. Crim. App. 2019); *see Flores v. State*, 491 S.W.3d 6, 9 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). Gowan bore the burden of persuasion on this question by a preponderance of the evidence. *See Asberry v. State*, 507 S.W.3d 227, 228 (Tex. Crim. App. 2016); 43B George E. Dix & John M. Schmolesky, *Texas Practice: Criminal Practice and Procedure* § 60:26 (3d ed. 2019).

18

Our review of the trial court's Article 64.04 ruling is bifurcated: We defer to the trial court's resolution of historical fact issues and of application-of-law-to-fact issues turning on credibility and demeanor, but we review any other application-of-law-to-fact issues de novo. *See Fain v. State*, No. 02-19-00217-CR, 2019 WL 6904548, at *5 (Tex. App.—Fort Worth Dec. 19, 2019, pet. ref'd) (mem. op., not designated for publication). Where the trial court did not enter separate findings of fact, we imply findings necessary to support its ruling so long as they are reasonably supported by the record. *See Dunning*, 572 S.W.3d at 692. We must consider all the evidence that the convicting court considered in reaching its decision under Article 64.04. *See id.* at 696 (citing *Asberry*, 507 S.W.3d at 228–29). Here, the convicting court considered the trial testimony, the filings in the case, the DNA test results, the testimony and evidence presented at the hearings, and counsel's arguments.

Even so, there is one important, jurisdictional limit to our review of the trial court's Article 64.04 ruling: Chapter 64 does "not confer jurisdiction upon this court to entertain collateral attacks on the trial court's judgment or to review, under the guise of a DNA testing appeal, anything beyond the scope of those articles." *Reger v. State*, 222 S.W.3d 510, 513 (Tex. App.—Fort Worth 2007, pet. ref'd); *see also Diaz v. State*, No. 02-17-00003-CR, 2018 WL 359958, at *1 (Tex. App.—Fort Worth Jan. 11, 2018, no pet.) (mem. op., not designated for publication).

19

## B. TEST RESULTS DID NOT CAST
### AFFIRMATIVE DOUBT ON GOWAN'S CONVICTIONS

In his first issue, Gowan argues that had the jury heard the later DNA test results, it would not have convicted him because the results showed that the forensic evidence was "bad science." Gowan raises myriad assertions as to why the evidence heard at the Article 64.04 hearing mandated a finding that his convictions were called into doubt. We do not address each assertion, many of which impermissibly attempt to belatedly attack the admissibility of trial evidence; instead, we focus on whether the trial court's implied and expressly found facts were supported by the record and whether those facts support a legal conclusion that it was reasonably probable that Gowan would have been convicted even if these DNA results had been available at trial. *See Reger*, 222 S.W.3d at 513.

As we have recounted, the only tested hairs that excluded Gowan as a contributor were Hair #3 and Hair #4—two hairs found in the van's carpet. But Hair #2, also found in the van's carpet, was determined to be Michelle's through nuclear DNA testing before trial. Michelle and her matrilineal relatives could not be excluded as a contributor to Hair #2 after mitochondrial DNA testing was performed under Article 64.03. Further Hair #8, which was found in the Duval closet, was also found to be Michelle's after nuclear DNA testing. In short, Hair #2 placed Michelle in the van, and Hair #8 placed Michelle in the closet. This evidence along with the inculpatory trial evidence recounted by the State at the first Article 64.04 hearing

20

shows that Gowan's exclusion as a contributor to Hair #3 or Hair #4 did not cast affirmative doubt on his convictions. *See Dunning*, 572 S.W.3d at 693, 698; *Soloman v. State*, No. 02-13-00593-CR, 2015 WL 601877, at *6 (Tex. App.—Fort Worth Feb. 12, 2015, no pet.) (mem. op., not designated for publication); *Glover v. State*, 445 S.W.3d 858, 862 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). Although Gowan now impermissibly attacks the strength and admissibility of the nonforensic evidence admitted at trial, the jury was entitled to credit the admitted and inculpatory evidence. *See Glover*, 445 S.W.3d at 862; *see also Reger*, 222 S.W.3d at 513. Similarly, our review of a ruling under Article 64.04 requires us to defer to the trial court's findings of fact and credibility determinations leading to its ruling. *See Dunning*, 572 S.W.3d at 698. The trial court found that (1) all hairs on Michelle's clothing that produced nuclear DNA test results belonged to Michelle; (2) Hair #8 from the Duval closet was 12.5 million times more likely to be Michelle's than from an unknown individual; and (3) Hair #3 and Hair #4 from the van's carpet could be linked to neither Gowan nor Michelle. The trial court also recognized the other evidence admitted at trial that connected Gowan to the offenses, including the fact that carpet fibers identical to the carpet fibers in the van's carpet were found on Michelle's clothes. We infer that the trial court credited Filepe-Ortega's testimony that Michelle and her matrilineal relatives could not be excluded as contributors to Hair #2 based on mitochondrial DNA testing and that the trial court recognized that this hair had previously been found to be Michelle's based on nuclear DNA testing. These findings, which we defer to,

supported the trial court's conclusions that had the test results been available during Gowan's trial, it was not reasonably probable that he would not have been convicted. Based on the evidence at trial and from the Article 64.04 hearings, we cannot conclude that the trial court erred by applying its found facts to its legal determination that the test results did not cast doubt on Gowan's convictions. *See, e.g.*, *Dunning*, 572 S.W.3d at 693–94, 696–98; *Rodriguez v. State*, No. 05-18-01273–CR, 2019 WL 3369751, at *3 (Tex. App.—Dallas July 26, 2019, no pet.) (mem. op., not designated for publication); *Soloman*, 2015 WL 601877, at *5–6; *Glover*, 445 S.W.3d at 862. Gowan failed to meet his burden under Article 64.04, and we overrule issue one.

## IV. ASSISTANCE OF COUNSEL: DEPRIVATION AND INEFFECTIVENESS

### A. DEPRIVATION OF COUNSEL BASED ON DELAYED APPOINTMENT OR INVOLUNTARY WAIVER

In issue two, Gowan argues that the trial court erred by granting his pro se motion for forensic DNA testing without first appointing counsel. This failure, Gowan contends, thwarted an appropriate identification of what hairs should be tested under which testing method. Gowan was statutorily entitled to appointed counsel for purposes of his postconviction motion for forensic DNA testing. *See* Tex. Code Crim. Proc. Ann. art. 64.01(c). This right to counsel is triggered if the convicted defendant notifies the trial court that he wishes to file a motion for DNA testing, the court finds reasonable grounds for such a motion, and the court determines that the defendant is indigent. *See id.* We review this determination for an

22

abuse of discretion. *Gutierrez v. State*, 307 S.W.3d 318, 323 (Tex. Crim. App. 2010); *In re Marshall*, 577 S.W.3d 581, 583 (Tex. App.—Houston [14th Dist.] 2019, orig. proceeding) (per curiam).

Gowan filed his motion pro se and thereafter began requesting counsel to either fix any problems found in his motion or to investigate the State's forensic evidence. After the trial court determined there were reasonable grounds for the motion based on the State's not opposing the motion and after the trial court ordered the testing, the trial court granted Gowan's requests for counsel and appointed Hull. These Article 64.01(c) findings were required before the trial court was empowered to appoint counsel, and Gowan's complaint that Hull was not appointed quickly enough after he filed his pro se motion is spurious, especially in light of the fact that the trial court granted Gowan's testing request. *See Marshall*, 577 S.W.3d at 583.

Additionally, even if the trial court abused its discretion by failing to appoint counsel earlier, Gowan's remedy would be a remand to the trial court so he could file a subsequent motion for forensic DNA testing with the assistance of counsel. *Gutierrez*, 307 S.W.3d at 323. Gowan was assisted by more than one appointed attorney over the course of this proceeding; thus, there would be no harm to Gowan even if we were to find an abuse of discretion. *See* Tex. R. App. P. 44.2(b); *Hooks v. State*, 203 S.W.3d 861, 864 (Tex. App.—Texarkana 2006, pet. ref'd). We overrule issue two.

23

In his fourth issue, Gowan asserts that he was deprived of counsel at the first Article 64.04 hearing, essentially being forced to choose between incompetent representation by Bennett and self-representation. In other words, he argues that his decision to proceed pro se at the first Article 64.04 hearing with Bennett as stand-by counsel was involuntary. As we previously discussed, before the first hearing began, the trial court addressed Gowan's motion to represent himself, which he had filed the week before. In his motion, Gowan stated that he knew the facts of the case, that Bennett would not advise him regarding whether "further investigation" was warranted, and that he "should have no difficulty presenting [his] case." At the hearing, Gowan again stated that he wanted to represent himself, affirmed that he knew the dangers of doing so, and stated he was competent to do so. In fact, when the trial court warned Gowan that he could "lose whatever defenses [he] may have that some attorney might be able to help [him] with," Gowan stated that he was "aware of the law sufficiently that [he was] not really concerned about that." Bennett informed the trial court that Gowan would do a "fair job . . . for a layman" of representing himself. Although the trial court concluded that Gowan's waiver was knowing, intelligent, and voluntary, it also allowed Bennett to assist as stand-by counsel at Gowan's request.

We review the trial court's decision to grant Gowan's self-representation motion for an abuse of discretion. *See McCain v. State*, No. 02-17-00210-CR, 2018 WL 3059964, at *5 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op., not

designated for publication).  A waiver of counsel is voluntary if it is made with a complete understanding of the right being abandoned as well as the dangers and disadvantages of self-representation.  *See id.*  Here, the record reflects that the trial court extensively warned Gowan about the dangers of self-representation and went so far as to inform Gowan that self-representation would be a "mistake."  We conclude the trial court did not abuse its discretion based on Gowan's repeated insistence that he wanted to represent himself and his assertion that he would be able to present his case because he was sufficiently knowledgeable of the law and the facts.  *See, e.g.,* *McIntosh v. State*, No. 02-17-00378-CR, 2019 WL 983725, at *3–4 (Tex. App.—Fort Worth Feb. 28, 2019, no pet.) (mem. op., not designated for publication); *McCain*, 2018 WL 3059964, at *5–6.  Accordingly, his waiver was voluntary and not coerced.  *McIntosh*, 2019 WL 983725, at *4.  We overrule issue four.

### B. INEFFECTIVE ASSISTANCE OF COUNSEL

In his third and fifth issues, Gowan argues that Hull and Payne rendered constitutionally ineffective assistance during the Chapter 64 proceeding.  The State argues that because there is no constitutional right to counsel under Chapter 64, only a statutory right to counsel, the constitutional representation requirements do not apply.  Indeed, some intermediate appellate courts have held that a claim that counsel appointed under Article 64.01(c) was constitutionally ineffective is not cognizable in an appeal from the trial court's ruling under Chapter 64.  *See Hooks*, 203 S.W.3d at 865; *Kitt v. State*, No. 01-04-00633-CR, 2005 WL 2385619, at *2 (Tex. App.—Houston

25

[1st Dist.] Sept. 29, 2005, pet. ref'd) (mem. op., not designated for publication); *Hughes v. State*, 135 S.W.3d 926, 927–28 (Tex. App.—Dallas 2004, pet. ref'd); *In re Beasley*, 107 S.W.3d 696, 697 (Tex. App.—Austin 2003, no pet.); *Morris v. State*, 110 S.W.3d 100, 103 (Tex. App.—Eastland 2003, pet. ref'd). One court has applied the constitutional guarantees to the statutory right to counsel under Chapter 64. *See Ard v. State*, 191 S.W.3d 342, 344–46 (Tex. App.—Waco 2006, pet. ref'd). The Court of Criminal Appeals has not decided the issue, choosing instead to assume that the constitutional requirements apply in a Chapter 64 proceeding and concluding that the right was not violated. *See Bell v. State*, 90 S.W.3d 301, 307 (Tex. Crim. App. 2002); *see also Kingery v. State*, No. 14-11-00318-CR, 2012 WL 456953, at *2 (Tex. App.—Houston [14th Dist.] Feb. 14, 2012, no pet.) (mem. op., not designated for publication). We have not directly decided this issue, but we have addressed, in an appeal from the denial of testing under Article 64.03 and without discussing this dichotomy, whether appointed counsel was ineffective for failing to request forensic DNA testing on certain items. *See Fain v. State*, No. 02-10-00412-CR, 2012 WL 752652, at *8–9 (Tex. App.—Fort Worth Mar. 8, 2012, pet. ref'd) (mem. op., not designated for publication). Under the facts presented here, we conclude it is unnecessary to definitively decide the issue because Gowan cannot demonstrate he received constitutionally ineffective assistance, even if such a claim is cognizable in an appeal from a Chapter 64 proceeding. *See Bell*, 90 S.W.3d at 307.

26

To establish ineffective assistance of counsel, Gowan must prove by a preponderance of the evidence that counsel's representations were deficient and that these deficiencies prejudiced his case under Chapter 64. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). But our review is highly deferential and we presume that counsel met the constitutional requirements. *Id.*

Gowan asserts that Hull improperly waived Gowan's right to a hearing on Hull's motion to withdraw from representation. He argues that the lack of a hearing precluded him from "substantiat[ing] the merit of his objection"—Hull "essentially assisted the State" by "concealing" Linch's contamination of the hair evidence. First, Hull was allowed to withdraw and the trial court appointed Bunch, then Bennett, to represent Gowan for the purposes of Article 64.04. Gowan cannot show prejudice when he received the relief he sought—the withdrawal of Hull and the appointment of new counsel. *See Bell*, 90 SW.3d at 304, 307. Second, Gowan made his fabrication and tampering arguments to the trial court in his Article 64.01 motion, in his numerous pro se filings before Hull was appointed, and at the first Article 64.04 hearing. Because the trial court had these arguments before it when ruling under Article 64.04, Gowan cannot show prejudice from the lack of an opportunity to raise these arguments at a withdrawal-motion hearing. *See, e.g.*, *id.* at 307; *Crawford v. State*, 355 S.W.3d 193, 199 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (op. on reh'g). We overrule issue three.

27

Gowan contends that Payne was ineffective in two respects at the second Article 64.04 hearing: (1) he failed to "learn" that hairs found in the van's carpet had been contaminated, contradicting the State's theory that Michelle's forcibly removed hairs were found in the van, and (2) he failed to identify Linch as "the person who contaminated the roll of carpet to fabricate nuclear . . . DNA evidence used by the State at trial." The contamination–fabrication evidence, Gowan asserts, would have changed the outcome of his trial and, presumably, the trial court's Article 64.04 ruling.

At the second Article 64.04 hearing regarding Hair #2, Payne argued that Gowan was entitled to postconviction relief because (1) "mitochondrial testing indicates that a family member is just as likely to have contributed that hair [i.e., Hair #2] as the victim in that case" and (2) "that hair is different from the one that was talked about at trial" because it apparently had not been forcibly removed and was the wrong length. Although Payne did not use the specific words Gowan seems to prefer—fabrication, contamination, and *Routier*[14]—the gist of the argument was presented to, yet impliedly rejected by, the trial court. Gowan has failed to show either deficient performance or prejudice arising from Payne's failure to make these

_____

[14]Gowan relies heavily on this case in which the Court of Criminal Appeals held that in making a ruling under Article 64.04, the convicting court should consider "[o]nly those items that qualify for testing" under Article 64.01(b) in its "collective calculus" for determining whether the movant's conviction was called into doubt under Article 64.04. *Routier v. State*, 273 S.W.3d 241, 245 (Tex. Crim. App. 2008). *Routier* involved a review of the convicting court's denial of a motion for forensic DNA testing, not whether the results of any granted testing cast serious doubts on a conviction.

28

specific arguments, especially when the gist of those arguments was presented and especially when the length of the found hairs and whether they were forcibly removed were not linchpins of the State's theory of the case. *See Bell*, 90 S.W.3d at 307. Further, Gowan's contamination–fabrication arguments go beyond the scope of an Article 64.04 determination, *see Reger*, 222 S.W.3d at 513; thus, Payne cannot be found deficient for failing to raise the argument as posited by Gowan. We overrule issue five.

We additionally deny Gowan's December 23, 2019 motion to abate this appeal for a third hearing under Article 64.04 "with appointment of competent counsel" to raise his contamination–fabrication arguments. We have abated this appeal multiple times based on Gowan's inability to work with appointed counsel and based on Gowan's repeated assertions that he desired to represent himself. We see no reason to further delay this appeal in order for Gowan to present arguments that were repeatedly argued to, and rejected by, the trial court.

## V. CONCLUSION

Although Gowan and Michelle were excluded as contributors to Hair #3 and Hair #4, Hair #2 was linked to Michelle by mitochondrial and nuclear DNA testing. Hair #2 places Michelle in Gowan's van. And Hair #8, also linked to Michelle through nuclear DNA testing, placed Michelle in the Duval closet. This evidence, as credited and found by the trial court after two hearings under Article 64.04, supports the trial court's conclusions that the DNA testing did not cast serious doubt on

Gowan's convictions. The record does not support Gowan's complaints that he was denied appointed counsel after he filed his motion for forensic DNA testing or that his desire to represent himself at the first Article 64.04 hearing was involuntary. And Gowan has failed to establish that either Hull or Payne was constitutionally ineffective even if such a safeguard applies in a Chapter 64 proceeding. Accordingly, we affirm the trial court's orders concluding that even if the DNA test results had been available at Gowan's trial, it was not reasonably probable that Gowan would not have been convicted.

Per Curiam

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 23, 2020