

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-77,125

**WILLIAM DARIN IRVAN, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON DIRECT APPEAL OF A CHAPTER 64 PROCEEDING CAUSE NO. 0864928 IN THE 180TH DISTRICT COURT HARRIS COUNTY

*Per curiam*.

## O P I N I O N

Appellant William Darin Irvan was convicted of capital murder and sentenced to death in 2003 for the 1987 sexual assault and killing of Michelle Shadbolt. This Court affirmed Appellant's conviction and sentence on direct appeal. *Irvan v. State*, No. AP-74,853 (Tex. Crim. App. June 7, 2006) (not

designated for publication). After the completion of postconviction DNA testing pursuant to Texas Code of Criminal Procedure Chapter 64, the convicting court held an evidentiary hearing and issued findings of fact and conclusions of law. Therein, the court concluded that Appellant "fail[ed] to show that, had the results of the postconviction DNA testing been available during his trial, it is reasonably probable he would not have been convicted." *See* Art. 64.04.[1] In three issues, Appellant appeals the convicting court's finding. *See* Art. 64.05. For the reasons discussed below, we conclude that none of the issues are meritorious. Accordingly, we affirm the convicting court's determination.

I.     BACKGROUND

A.     Trial Evidence

Michelle Shadbolt was sexually assaulted and murdered in her home in 1987. She had been stabbed seventeen times, suffered a large neck laceration, and sustained blunt-force head injuries. She was found wearing only a shirt pulled up over her shoulders. There was no sign of forced entry into the residence. Michelle and her husband Jack had separated approximately six weeks before. The case remained unsolved.

---

[1] All references to "Article" in this opinion, unless we specify otherwise, are to the Code of Criminal Procedure.

In 1998, eleven years after the murder, evidence was submitted for DNA testing, which was then a recently available investigatory tool. Subsequent testing in 2002 revealed Appellant's DNA profile in the male fraction of Michelle's rectal swab (frequency 1-in-233,100 to 1-in-607,300) and vaginal swab (1-in-67.1 billion).

Appellant was subsequently indicted and tried for capital murder in December 2003. At trial, the State's theory was that Appellant, who was a childhood acquaintance of Michelle, murdered her in the course of committing or attempting to commit sexual assault. The defense argued that Appellant had a consensual sexual relationship with Michelle. However, the State presented evidence that, when Appellant was interviewed by police, he denied the existence of any romantic or sexual relationship. The record also included evidence of an incident several years before the murder in which Appellant allegedly inappropriately touched Michelle and evidence that Appellant kidnapped and attempted to rape another woman about a year after the murder.

The State presented testimony from Tamara Llamas, a convicted felon and Appellant's former girlfriend. Llamas claimed that Appellant confessed to her in 1987 that he "got carried away" and  killed Michelle after she refused to have sex with him. Llamas did not report the alleged confession until 2001.

Additional evidence showed that Appellant was excluded as the source of ridge detail found on a trophy at the crime scene, while other prints on a knife and the trophy lacked sufficient detail for identification or comparison purposes. Forensic analyst William Watson's pretrial DNA testing on two hairs excluded both Appellant and Michelle as contributors. The first hair (Hair 20A) was found in Michelle's fingernail scrapings. The second hair (Hair 30H) was found on the wheel of a vacuum cleaner near Michelle's body. The jury was aware of the print and the hair evidence recovered at the scene. The jury nevertheless convicted Appellant of capital murder.

B.     DNA Testing

Beginning in 2014, the convicting court entered a series of agreed orders authorizing Chapter 64 DNA testing. That testing spanned nearly a decade. Appellant was excluded as a contributor to all postconviction samples in which DNA profiles were obtainable.

Jack's DNA profile could not be excluded from several hairs recovered from the fitted sheet that was on Michelle's bed at the time of her murder. Hair 20A, as previously discussed, was recovered from Michelle's fingernail scrapings and subjected to DNA testing before trial. At trial, some testimony was presented that

Hair 20A was a "probable" pubic hair and that mitochondrial DNA (mtDNA) testing excluded both Michelle and Appellant as contributors. A DNA profile from Hair 20B, which was also recovered from fingernail scrapings, was likewise extracted in pretrial testing, but no mtDNA results were recorded, and there was no trial testimony about this hair. In the Chapter 64 proceeding, Hair 20B was forwarded for DNA testing, but no usable DNA profile could be obtained. Hair 30H (recovered from the vacuum cleaner wheel) was not retested, but Jack was excluded as a contributor. Additionally, all evidence submitted for Chapter 64 DNA testing was compared to a partial Short Tandem Repeat (STR) profile from an early suspect, Timothy Darden. These comparisons either resulted in exclusions or were deemed "uninformative."[2] Michelle's vaginal and rectal swabs were not retested.

C.     Article 64.04 Hearing

Three DNA experts testified at the April 2024 hearing: Jenny Lounsbury (DPS forensic scientist, trace evidence section), Jessica Ehmann (DPS assistant

---

[2] DPS analyst Jessica Ehmann explained that STR DNA testing results are reported as a likelihood ratio. Under previous DPS standards, likelihood ratios falling between .01 and 1,000 were categorized as "inconclusive." Under updated DPS standards, likelihood ratios falling between .5 and 2 are categorized as "uninformative," which indicates that the probability that the individual's profile was part of the sample's profile is nearly equal to the probability that the individual's profile was not part of the sample's profile.

technical leader, DNA section), and Elizabeth Johnson Ph.D. (Appellant's postconviction forensic DNA expert). The court limited Johnson's live testimony to her explanation of the DNA testing results, but it admitted her written report into evidence. Johnson's report addressed both pretrial and postconviction DNA testing and included her evaluation of pretrial laboratory procedures.

D.     The Convicting Court's Findings of Fact and Conclusions of Law

After summarizing the evidence presented at trial, the results of all DNA testing, and the evidence presented at the Article 64.04 hearing, the convicting court concluded that Appellant "fail[ed] to show that, had the results of the postconviction DNA testing been available during his trial, it is reasonably probable he would not have been convicted."

## II.     ISSUES PRESENTED

In his appeal, Appellant raises three issues:

(1)     Whether the convicting court improperly excluded critical witness testimony at the Article 64.04 hearing, thereby hindering Appellant from meeting his burden under the statute.

(2)     Whether the convicting court erred in finding that it is not reasonably probable that, had the postconviction DNA testing results been available at trial, Appellant would not have been convicted.

(3)     Whether the convicting court erred in denying Appellant's

request to order submission of Hair 30H's DNA profile to the Combined DNA Index System (CODIS) under Article 64.035.

## III.    APPLICABLE LAW

Article 64.04 provides that after examining postconviction DNA testing results, "the convicting court shall hold a hearing and make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted." Appellant bears the burden of proof. *See Dunning v. State*, 572 S.W.3d 685, 693 (Tex. Crim. App. 2019).

An affirmative or favorable answer to the Article 64.04 inquiry requires that the DNA testing results "affirmatively cast doubt" on the conviction's validity; results that merely "muddy the waters" by raising theoretical possibilities will not suffice. *See Ex parte Gutierrez*, 337 S.W.3d 883, 892 (Tex. Crim. App. 2011). "When post-conviction testing leaves the court with a question, the court looks to the evidence raised at trial to determine if the jury would still have convicted the appellant had this evidence been presented to them." *Raby v. State*, No. AP-76,970, slip op. at 13. (Tex. Crim. App. Apr. 22, 2015) (not designated for publication).

Although *Raby* is an unpublished opinion, it is persuasive. In *Raby*, we relied

on and quoted the published *Gutierrez* decision when analyzing whether DNA testing results would have altered the trial landscape. *See Raby*, slip op. at 13 (citing *Gutierrez*, 337 S.W.3d at 892). Although the procedural contexts differ—with *Gutierrez* involving a testing request under Article 64.03 and *Raby* involving post-testing findings under Article 64.04—that difference does not change the underlying legal analysis. In both contexts, a "favorable" result means one that affirmatively casts doubt on the conviction rather than merely introducing uncertainty. *See* Art. 64.03(a)(2)(A)(stating that "the person would not have been convicted if exculpatory results had been obtained through DNA testing"); Art. 64.04 (stating that "had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted"). The governing question is the same: whether it is likely that the person would not have been convicted had the results been available at trial. Thus, judicial interpretations of this materiality standard apply equally to both stages of the Chapter 64 inquiry. *See Asberry v. State*, 507 S.W.3d 227, 228-29 (Tex. Crim. App. 2016) ("[W]e do not see any reason to treat a review of a ruling pursuant to Article 64.04 differently than a ruling pursuant to Article 64.03.").

Ultimately, when reviewing an Article 64.04 finding, we apply a bifurcated

standard of review. *Skinner v. State*, 665 S.W.3d 1, 16 (Tex. Crim. App. 2022). Under this bifurcated standard, we give almost total deference to the convicting court's determination of historical facts and application-of-law-to-fact questions turning on witness credibility and demeanor. *Id.* When reviewing other application-of-law-to-fact questions, we defer to the convicting court's subsidiary findings of historical fact, but we review its application of the law to those facts *de novo*. *Id.*

IV.    ANALYSIS

A.    Issue One: Limitations on Testimony

According to Appellant, the convicting court hindered his ability to meet his burden by restricting testimony at the Article 64.04 hearing to explanation of the postconviction DNA testing results. He says that the court improperly prevented Watson's live testimony regarding pretrial sample collection methods and observations and prevented Johnson's live testimony regarding pretrial testing procedures and evidence handling. We review the court's evidentiary rulings for an abuse of discretion. *Prystash v. State*, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999). A court abuses its discretion when its ruling falls outside the zone of reasonable disagreement. *See State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).

Article 64.04 directs the convicting court to examine the results of postconviction testing and assess their effect on the trial outcome. While the court considers all trial evidence in assessing the significance of the new DNA test results, Article 64.04 itself is narrowly focused on evaluating whether the new DNA evidence creates a reasonable probability of non-conviction. *See* Art. 64.04 (requiring the convicting court to hold a hearing and determine "whether, had the *results* been available during the trial of the offense, it is reasonably probable that the person would not have been convicted") (emphasis added). This Court has recognized the scope of Article 64.04 hearings is limited to explaining and evaluating the DNA testing results rather than allowing broad relitigation of the underlying case. In *Rivera v. State*, we explained that Article 64.04 hearings serve as a forum to submit evidentiary matters relating to "test results." 89 S.W.3d 55, 59 (Tex. Crim. App. 2002). In *Raby*, we concluded that "evidence presented at a Chapter 64 hearing [under Article 64.04] should be limited to the explanation of the results of the new DNA testing" and emphasized that such hearings are not retrials. No. AP-76,970, slip op. at 20. Here, the convicting court did not abuse its discretion in confining live testimony to explanation and interpretation of postconviction DNA testing results.

Further, even assuming error, any such error was harmless. *See* Tex. R. App. P. 44.2(b). The information Appellant claims was improperly excluded was in fact before the court. The convicting court admitted Johnson's comprehensive written report, which addressed both Watson's pretrial testing and the postconviction testing. Appellant has not shown how additional live testimony would have altered the court's ultimate finding on the Article 64.04 inquiry, particularly given that Appellant's DNA in Michelle's vaginal and rectal swabs—which were never retested—remains compelling incriminating evidence.

We overrule Issue One.

B.      Issue Two: Reasonable Probability Finding

Appellant argues that the postconviction DNA exclusions create a reasonable probability that he would not have been convicted had these results been available at trial. He contends that the convicting court: (1) failed to consider how the postconviction testing critically weakened the State's trial theory; (2) exceeded Article 64.04's scope by making findings about his consensual relationship argument, which he says are unrelated to DNA testing results; (3) adopted findings unsupported by the record, particularly regarding the non-characterization of Hair 20B as a pubic hair and the insignificance of Jack's hair

evidence; and (4) improperly substituted its own judgment for that of a jury by making credibility determinations and weighing evidence rather than assessing whether a reasonable jury would still unanimously convict.

      1.      Convicting Court's Alleged Failure to Properly Consider the Postconviction DNA Testing Results

Appellant argues that because the prosecution's case was almost entirely circumstantial, evidence excluding him from crime-proximate biological material would have fundamentally altered at least one juror's decision. He emphasizes that both he and Jack are excluded from crime-proximate hairs—one from Michelle's fingernail scrapings (Hair 20B) and one from the vacuum cleaner wheel (Hair 30H)—and he argues these results introduce an unknown perpetrator. Appellant also emphasizes the DNA results showing the probable presence of Jack's hair on Michelle's fitted bed sheet. Appellant asserts that these DNA results contradict the prosecutor's trial argument that DNA testing eliminated Jack as a suspect. Additionally, Appellant stresses that the State's case included no eyewitnesses, no fingerprints, and no physical evidence in the home connecting him to the murder. Instead, Appellant notes that the State relied heavily on testimony from his former girlfriend Llamas, who first reported his alleged 1987 confession in 2001, roughly fourteen years after the murder.

We disagree that the convicting court failed to consider the DNA testing results in the context of the trial as a whole. It determined that the core inculpatory evidence remains unchanged by postconviction testing: Appellant's DNA was found in Michelle's vaginal and rectal swabs at statistically significant frequencies. Appellant did not request that these swabs be retested. The convicting court found Appellant's consensual relationship theory not credible based on: Appellant's denial to police of any romantic or sexual relationship with Michelle; trial testimony that Michelle was not dating; and the absence of credible evidence supporting the existence of such a relationship. The record supports these credibility findings, and they are entitled to deference.

The fact that postconviction DNA testing excluded Appellant from other evidence does not affirmatively cast doubt on his conviction. The jury heard evidence that investigators found unidentified hairs at the scene, including Hair 20A from fingernail scrapings and Hair 30H from the vacuum wheel, and yet convicted Appellant. The postconviction testing results merely confirm what the jury already knew: some biological material at the scene came from unidentified sources.

Further, Appellant's reliance on the discovery of Jack's hair on the fitted

bed sheet is misplaced. Michelle was killed in the living room, not the bedroom, and there was no blood or semen in the bedroom. Jack lived in the home until six weeks before the murder, and thus finding his hair on the bed sheet is not remarkable. We have explained that "the significant possibility of DNA being deposited by an innocent person reduces the probative value of any exculpatory DNA test result." *Hall v. State*, 569 S.W.3d 646, 658 (Tex. Crim. App. 2019). And as we have also noted, the fact that someone else's DNA is found at a crime scene does not necessarily establish favorability when there is substantial evidence of guilt. *See State v. Swearingen*, 424 S.W.3d 32, 38-39 (Tex. Crim. App. 2014).

Appellant further emphasizes that the prosecutor argued to the jury that DNA testing "cleared, once and for all, Jack Shadbolt." However, the prosecutor's argument referred to Jack's exclusion from Michelle's vaginal and rectal swabs where Appellant's DNA was found at statistically significant frequencies. The postconviction discovery of Jack's hair on the fitted bed sheet in a room where he slept until six weeks before the murder and where there is no evidence that an assault occurred does not contradict the prosecutor's argument.

Appellant fails to demonstrate that the convicting court did not consider the DNA testing results in the context of the trial as a whole or that those results

critically undermine the State's case.

      2.     Convicting Court's Findings Allegedly Outside Article 64.04's Permissible Scope

Appellant argues that the convicting court exceeded its authority under Article 64.04 by making credibility findings about the existence of a consensual romantic or sexual relationship between himself and Michelle. He contends that Article 64.04 hearings are narrowly limited to evidentiary matters relating to DNA testing results and that the court erred by making findings about trial evidence unrelated to the DNA testing. He also asserts that postconviction DNA testing results cannot establish whether the sexual encounter was consensual. The State counters that the convicting court properly considered trial evidence and argues that Appellant's complaint contradicts his earlier assertion that the court failed to properly consider all the trial evidence.

While Article 64.04 hearings serve as "a forum to submit evidentiary matters relating to the test results," *Rivera*, 89 S.W.3d at 59, we have made clear that courts must consider the trial evidence as a whole when determining whether DNA results are favorable. *See Dunning*, 572 S.W.3d at 697-98. This is because Article 64.04 requires the convicting court to evaluate whether new DNA evidence, when considered alongside all trial evidence, creates a reasonable

probability that an appellant would not have been convicted had those results been available at trial. This requires courts to consider trial evidence—not to conduct a wholesale retrial of the underlying offense, but to determine whether the new DNA evidence, viewed alongside all other trial evidence, affirmatively casts doubt on the conviction's validity.

Here, the convicting court's evaluation of Appellant's consensual relationship theory—a credibility assessment—falls squarely within this framework and directly relates to determining the significance of the Chapter 64 DNA testing results. In deciding whether there is a reasonable probability that a jury would not have convicted Appellant had the jury heard the new DNA evidence, the court was required to consider how a rational jury would likely view Appellant's proffered explanation for the presence of his DNA profile in Michelle's vagina and rectum in light of the full trial record. This record included Appellant's pretrial denial of any romantic or sexual relationship and the testimony of multiple witnesses who denied such a relationship existed, which is reflected in the court's findings. The court permissibly found that Appellant's explanation was weak and that a reasonable jury would be unlikely to give it substantial weight even given the new DNA results.

Moreover, the court did not treat this finding as dispositive of the Article 64.04 inquiry. As the convicting court recognized, the new DNA exclusions largely confirm the trial evidence, *i.e.*, that biological material from unidentified contributors was present at the scene. But the jury knew this, and the State's case nevertheless persuaded it beyond a reasonable doubt. We agree that the additional postconviction exclusions do not diminish the strong inculpatory force of the vaginal and rectal DNA evidence and Appellant's alleged confession; they merely refine the understanding of whose DNA is not present in certain locations without supplying an affirmative alternative perpetrator or undermining the core evidence upon which the jury relied.

Appellant fails to show that the convicting court erroneously made findings outside Article 64.04's permissible scope.

        3.      Convicting Court's Findings Allegedly Unsupported by the Record

Appellant claims that the convicting court mischaracterized evidence and drew improper causal inferences, making its findings unsupported by the record. As discussed below, these challenges lack merit.

First, Appellant argues the convicting court's dismissal of Jack's hair on the bed sheet reflects flawed reasoning. He emphasizes that Jack was the State's initial

suspect and that six weeks of separation is substantial enough to question why his hair's presence should be deemed insignificant. The State counters that Jack's hair on a bed he slept in until six weeks before the murder is exactly where it would be expected to be found. More critically, the State emphasizes that Michelle was not killed in the bedroom but in the living room. The State argues that this spatial disconnect, combined with the absence of blood or semen in the bedroom, undermines any inference that Jack's hair on the bed sheet implicates him in the offense. Nothing suggests that the convicting court improperly assessed this bed sheet hair evidence, nor were the court's findings unsupported by the record.

Second, Appellant argues that the convicting court wrongly equated the presence of his DNA in Michelle's vagina and rectum as proof that a sexual assault occurred and that any sexual contact coincided with the murder. At trial, the defense argued that the presence of Appellant's DNA in Michelle's vagina and rectum could be due to consensual sexual contact unrelated to the murder. In closing argument, the State rejected the consensual relationship claim as lacking any credible evidence to support it and pointed to additional physical evidence—bloody fingermarks on Michelle's "rear end"—as corroboration that a sexual assault occurred. Nothing suggests that the convicting court erred in

assessing the vaginal and rectal DNA swab evidence in light of the new DNA testing, nor were the court's findings unsupported by the record.

Third, Appellant asserts that the convicting court factually erred in finding that he presented no evidence that Hair 20B found under Michelle's fingernail was a pubic hair. Appellant is correct that some evidence was presented on this point. Watson's pretrial testing notes described Hair 20B as a "probable" pubic hair based on morphology, and Johnson relied on that characterization in her testimony. Lounsbury described Hair 20B as "wiry and coarse" but classified it as a "hair fragment" because she could not determine whether it was pubic or head hair.

Nevertheless, the convicting court's finding reflects the weight it assigned to competing expert testimony, not a determination that no evidence existed. Watson was not a trained hair examiner and qualified his opinion as only "probable." Lounsbury, a forensic scientist trained in trace evidence analysis, examined the same hair and testified she could not definitively determine its type. Johnson acknowledged she had no formal training in hair examination. The convicting court permissibly credited Lounsbury's more qualified opinion over Watson's tentative characterization and Johnson's derivative testimony. The convicting court's credibility determination is entitled to deference.

Appellant fails to show that the convicting court made findings unsupported by the record.

4.      Convicting Court's Credibility Determinations and the Jury's Role

Appellant argues that the convicting court improperly substituted its own judgment for that of a jury by making credibility determinations and weighing evidence. He contends that Article 64.04 requires courts to assess whether a reasonable jury, presented with new DNA testing results, would still unanimously convict, not whether the court itself finds the evidence credible. Appellant asserts that the convicting court overstepped by: characterizing Lounsbury's Hair 20B testimony as credible; labeling Johnson an advocate rather than an objective expert and rejecting her opinions; declaring that DNA results labeled "uninformative" have no evidentiary weight; and deeming Appellant's consensual relationship theory incredible. The State counters that Appellant merely disagrees with the convicting court's Article 64.04 conclusion and fails to demonstrate how the new DNA evidence meaningfully differs from what the jury considered at trial.

Although the jury was the factfinder at trial, Article 64.04 necessarily assigns the convicting court the role of resolving factual disputes and making credibility determinations at the Article 64.04 hearing to aid its statutory inquiry.  *See*

*Dunning*, 572 S.W.3d at 696. The court does not conduct a new trial, but instead evaluates how a reasonable jury would likely regard the evidence in light of the court's credibility findings. *Id.* The convicting court's credibility assessments regarding the reliability of Johnson's opinions—particularly her characterization of Hair 20B as pubic hair without any formal training in hair examination—fall within this proper role. Similarly, the convicting court's determination that the "uninformative" DNA result regarding Darden has no evidentiary weight is a reasonable assessment: evidence equally consistent with inclusion and exclusion provides no meaningful support for either position. The convicting court's finding that Appellant's consensual relationship theory lacked credibility, supported by the record as discussed above, reflects an appropriate step in the Article 64.04 analysis rather than an improper substitution of the court's own judgment for that of a jury. Appellant fails to demonstrate that the convicting court impermissibly made credibility determinations in violation of Article 64.04.

In all, the presence of Appellant's DNA in Michelle's vagina and rectum, combined with his alleged confession to Llamas and the convicting court's finding that Appellant's consensual relationship theory lacks credibility, constitutes compelling inculpatory evidence. When considered with this evidence, the

postconviction DNA exclusions do not create a reasonable probability that Appellant would not have been convicted had these results been available at trial. The convicting court's Article 64.04 finding is supported by the record, and the convicting court did not err in entering it. We overrule Issue Two.

C.      Issue Three: CODIS Submission

Appellant argues that the convicting court erred in denying his request to order submission of the Hair 30H DNA profile to CODIS under Article 64.035. That statute provides:

> If an analyzed sample meets the applicable requirements of state or federal submission policies, on completion of the testing under Article 64.03, the convicting court shall order any unidentified DNA profile to be compared with the DNA profiles in: (1) the DNA database established by the Federal Bureau of Investigation; and (2) the DNA database maintained by the Department of Public Safety under Subchapter G, Chapter 411, Government Code.

Art. 64.035. Appellant's reliance on this provision is misplaced.

First, Article 64.035's mandatory comparison obligation is triggered only on completion of testing under Article 64.03. That is, Article 64.035 applies only to DNA profiles generated on completion of Chapter 64 testing, not to pretrial profiles developed outside the statutory postconviction testing framework. Hair 30H's DNA profile was generated during pretrial investigation, not "on

completion" of Chapter 64 testing. Because Hair 30H's profile was not generated through Chapter 64 postconviction testing, the statute's plain language does not encompass it.

Second, Appellant presented no evidence establishing that Hair 30H's DNA profile met the applicable requirements of state or federal database submission policies. The convicting court has no authority to order submission of profiles that fail to satisfy the technical standards established by the administering agencies for CODIS inclusion.

We hold the convicting court correctly concluded that Article 64.035 does not apply to pretrial DNA profiles generated outside Chapter 64 proceedings. We overrule Issue Three.

V.     CONCLUSION

The convicting court properly exercised its discretion in conducting the Article 64.04 hearing, correctly applied the reasonable-probability standard in evaluating the postconviction DNA testing results, and appropriately denied CODIS submission of Hair 30H's profile under Article 64.035. Appellant has not shown that the postconviction DNA exclusions affirmatively cast doubt upon the validity of his conviction. The core inculpatory evidence—his DNA in Michelle's

vagina and rectum at statistically significant frequencies—was never retested postconviction and remains probative. This incriminating evidence, combined with Appellant's alleged confession to a former girlfriend and the convicting court's supported finding that his consensual relationship theory lacks credibility, constitutes substantial evidence that the Chapter 64 DNA testing has not overcome. We affirm the convicting court's Article 64.04 determination.

Delivered: February 12, 2026
Do not publish